### STATE OF CONNECTICUT *v.* EBONY CASEY
### (AC 15847)

Landau, Schaller and Shea, Js.

Argued January 21—officially released April 29, 1997

*Daniel S. Blinn*, special public defender, with whom, on the brief, was *Gale E. Beckles* of the Pennsylvania Bar, special public defender, for the appellant (defendant).

*Paul J. Ferencek*, assistant state's attorney, with whom, on the brief, were *Patricia A. Swords*, state's attorney, and *Jason Schroder*, certified legal intern, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Ebony Casey, appeals[1] from the judgment of conviction rendered after a condi-

---

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

tional plea of nolo contendere made pursuant to General Statutes § 54-94a to the charges of robbery in the first degree in violation of General Statutes § 53a-134 and felony murder in violation of General Statutes § 53a-54c.[2] On appeal, the defendant claims that the trial court improperly (1) refused to suppress her custodial statement and (2) refused to suppress detention scene identifications. We affirm the judgment of conviction.

The following facts are necessary for the resolution of this appeal. On June 14, 1994, at approximately 5 p.m., the defendant was driving through Rockville in a turquoise Chevrolet Beretta with Edwin Ross and two other males. While driving, they spotted Benny Cruz and targeted him as a possible robbery victim. Before approaching Cruz, they dropped off one of the passengers at a video store in Rockville and returned to the area where they had spotted Cruz. When they saw him, they called to him to come over to the car. When Cruz got near the car, the defendant exited the vehicle, stuck a pistol in his chest, demanded that he give her his money and removed a gold chain from his neck. Cruz then threw $7 on the ground and ran away.

After robbing Cruz, the defendant and the two passengers drove to the residence of Joey Michaud. Upon arriving, they went to the rear of Michaud's residence. When Michaud came to the window to see who was there, he was confronted by the defendant and the two other individuals who demanded that he give them drugs or other valuables. When Michaud refused, the defendant took out her pistol and shot him through the window. Michaud died from the gunshot wound. The defendant and the two other individuals immediately fled from Michaud's home in the Beretta. On their way out of Rockville, they stopped at the video store and picked up the passenger.

---

[2] The defendant entered this plea conditional on the right to appeal the trial court's denial of her motion to suppress evidence.

Shortly after the shooting, Sergeant Richard Simon and Detective Bart Zamichiei of the Vernon police department were dispatched to Michaud's house on a report that Michaud had been shot. They arrived at Michaud's house at approximately 5:25 p.m. At approximately 5:35 p.m., Simon and Zamichiei spoke with Lauren Vitale who was in the house with Michaud when he had been shot. Vitale told them that she and Michaud had been watching television in Michaud's bedroom when they heard knocking on the rear door of the apartment. She indicated that when Michaud went to the window to see who was knocking she was able to see the individuals who were standing outside. She indicated that she saw the defendant and two black males standing outside and that all three individuals wore their hair in dreadlocks. She described the female as wearing a black T-shirt with white lettering, one male as tall, wearing a white T-shirt and green jeans, and the other male as a short "kid" wearing a gray shirt and blue jeans. Vitale also stated that she overheard the defendant ask Michaud if he had any drugs and that when Michaud indicated that he did not, she heard a loud cracking or popping noise and heard Michaud exclaim that he had been shot.

After the Vitale interview, Zamichiei interviewed Brian Grosjean, who lived in the second floor apartment of Michaud's residence. Grosjean told Zamichiei that he had heard the gunshot. He also indicated that he had noticed a dark colored vehicle parked in front of the house and saw a black female teenager emerge from it and walk toward the house.

While Simon and Zamichiei were investigating the murder scene, Officer Christopher Meyers, who was at the Vernon police station, overheard the initial radio dispatch of the Michaud shooting and responded to the crime scene. En route, he saw one of Michaud's friends, Duane Bailey, on Talcott Avenue. Meyers stopped Bai-

ley and spoke with him. Bailey told Meyers that shortly before the shooting he had seen a turquoise Grand Am type vehicle driving through the area and that he thought there were three black males in the vehicle. Meyers radioed this information to the police station at 5:34 p.m.

When Meyers arrived at the crime scene, he spoke with Matt Brown, Jeremy Kennan and Jeff Hansen. These individuals told Meyers that, approximately fifteen minutes before the shooting, a turquoise Beretta that was occupied by two black males and the defendant pulled up to them. They stated that the defendant was wearing braids and that she looked like a boy. They also indicated that she was in the front passenger seat of the Beretta. They told Meyers that when the Beretta pulled up next to them, the defendant asked if they knew where Cruz was and when they said that they did not, the Beretta drove off. Meyers radioed this new information to the police station at approximately 5:40 p.m. During the course of his investigation, Meyers also spoke to Donald Banning who told him that he was with Cruz earlier that evening when the defendant robbed Cruz at gunpoint.

Meanwhile, at approximately 5:38 p.m., Officer Richard Riggs of the South Windsor police department was dispatched to a service station on Sullivan Avenue on a report that a motor vehicle involved in a shooting in Vernon was in the area. The dispatch indicated that the vehicle in question was a turquoise Grand Am type vehicle occupied by three black males or two black males and one black female. The information regarding the vehicle's location had been obtained from a motorist who had been listening to his police scanner and had overheard the dispatcher relate the information originally obtained by Meyers. While Riggs was en route to the area where the vehicle was spotted, he received additional information from his dispatcher that the vehi-

cle in question was in fact a Chevrolet Beretta with license plate number 494JMG. Subsequently, Riggs spotted the vehicle on Sullivan Avenue and began following it. Shortly thereafter, Officer Michael Russotto, who was also responding to the dispatch, pulled onto Sullivan Avenue directly behind the Beretta. At approximately 5:40 p.m., as the Beretta turned right onto Route 5 in South Windsor, Russotto activated his lights and pulled the vehicle over to the right shoulder. Both Riggs and Russotto parked their cruisers directly behind the Beretta. Because the dispatch had indicated that the occupants were involved in a shooting, Riggs and Russotto waited for Officer Daniel Martin and Sergeant Michael Ritter to arrive before taking any action. When Martin and Ritter arrived, the officers performed a "high risk felony stop." Ritter supervised the stop. He closed down the southbound lane of Route 5 and appointed Riggs as cover officer. Riggs maintained constant visual contact with the Beretta. Russotto acted as the control officer. He spoke through the cruiser's public address system and ordered the defendant and the other suspects out of the Beretta one at a time with their hands on their heads. When they were outside of the vehicle, Russotto told them to place their hands on the roof of the car and to turn completely around and walk backward toward Martin. Russotto then directed each of them to kneel on the ground. Martin handcuffed and frisked the defendant[3] and the other suspects and then placed them in one of two police vehicles. Officer Paul Audette, who arrived on the scene shortly after the felony stop began, assisted Riggs and Russotto. All five officers had their guns drawn during this procedure, which lasted approximately ten minutes.

After securing the defendant and the other suspects, the officers obtained their names, addresses and bio-

---

[3] The officers testified that the defendant was not as thoroughly frisked as the male suspects because the South Windsor police department regulations do not permit male officers to pat down female suspects.

graphical information and radioed the police station to check for outstanding warrants. This check was negative. The officers then checked the Beretta's driver and passenger areas for weapons and opened the trunk for the sole purpose of ensuring that no other person was hiding in it. While searching the backseat of the Beretta, Russotto discovered a lock-blade knife. Audette and Martin searched the driver and passenger areas a second time to ensure that other weapons had not been overlooked. During this search, Martin found a .22 caliber shell casing. After this discovery, the officers removed the defendant and the other suspects from the police cruisers and frisked them a second time for weapons. None was found.

While the felony stop was being conducted, a dispatch came over the radio further describing the suspects in Michaud's shooting. The defendant and the other suspects generally matched the descriptions.

At approximately 5:50 p.m., Ritter directed his dispatcher to notify the Vernon police that witnesses were needed to identify the suspects.[4] Zameichiei, Meyers and Simon received this dispatch and, in the next fifteen minutes, gathered Vitale, Grossjean, Brown, Kennan, Hansen and Banning to participate in a show-up identification procedure at the detention site. At approximately 6:05, the Vernon officers and the six witnesses left Vernon for South Windsor. Commuter traffic was heavy and the parties did not reach the detention site until 6:29 p.m.

When the officers and the six witnesses arrived in South Windsor, they stopped approximately 150 yards from the detention area. Before they began, Simon con-

---

[4] Ritter testified at the suppression hearing that at the time he made the call for witnesses, he did not have probable cause to arrest the defendant and the other suspects and that if witnesses could not be provided he was going to have to let them go.

ferred with Ritter and the other officers about the identification procedure. The witnesses were instructed on more than one occasion not to discuss the case either before or after they viewed the suspects. Thereafter, the suspects were removed from the police cruisers and positioned on the side of the road. All of the suspects were handcuffed with their hands behind their backs. Each witness was individually driven to the area where the suspects were standing and viewed the suspects from inside the car at a distance of fifty feet. Vitale identified the defendant as the girl who was outside the window at Michaud's house. She said she was "200 percent sure" of her identification. She also identified Ross as the man who was with the defendant at Michaud's residence. Grosjean did not identify any of the suspects or the Beretta. Keenan identified the defendant, Ross and the vehicle. Hansen identified only the defendant. Brown identified the defendant and one of the other suspects. Banning identified the defendant, Ross and the vehicle. The last identification was made at 7:06 p.m.

After the identifications were made, the officers arrested the defendant and the other three suspects and transported them to the Vernon police station. While in custody, the defendant gave a statement in which she indicated that she was present when the robbery and shooting took place. Two of the men taken into custody gave statements implicating the defendant in the robbery and the shooting.

The defendant filed a motion to suppress her inculpatory statement and to suppress the identifications. The trial court denied the defendant's motion to suppress and ruled that the *Terry* stop was valid. See *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The trial court further concluded that the identification procedure was not unnecessarily or impermissibly suggestive and, on the basis of the totality of the circum-

stances, that the identifications were, nevertheless, reliable.

I

The defendant first claims that the trial court improperly refused to suppress her inculpatory statement following her arrest.[5] The defendant claims that because the actions of the police exceeded the permissible limits of an investigatory detention, any subsequent statement given by her should be excluded as product or "fruit" of police conduct in violation of the fourth amendment. See *State* v. *Miller*, 29 Conn. App. 207, 215, 614 A.2d 1229 (1992), citing *Wong Sun* v. *United States*, 371 U.S. 471, 484–88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

At the suppression hearing and in oral argument before this court, the defendant conceded that the initial *Terry* stop was proper. See *United States* v. *Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985) (if police have reasonable suspicion grounded in specific and articulable facts that person encountered involved in or wanted in connection with completed felony, then *Terry* stop permitted to investigate suspicion); *State* v. *Mitchell*, 204 Conn. 187, 195–96, 527 A.2d 1168, cert denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). We therefore need not address the propriety of the initial stop. See *State* v. *Bowden*, 15 Conn. App. 539, 543–44, 545 A.2d 591, cert. denied, 209 Conn. 810, 548 A. 2d 438 (1988). The constitutional issue raised by this stop, therefore, is whether the actions of the police officers exceeded the permissible limits of an investigative detention under *Terry* v. *Ohio*, supra, 392 U.S. 1.

"A *Terry* stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete

---

[5] The evidence that the defendant seeks to be suppressed is her statement.

the investigation for which that stop was made. . . . Like the determination of initial justification, this inquiry is fact-bound. . . . The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell,* supra, 204 Conn. 197; see also *State* v. *Torres,* 197 Conn. 620, 626, 500 A.2d 1299 (1985). "One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. A police officer who has proper grounds for stopping a suspect has constitutional permission to immobilize the suspect briefly in order to check a description or an identification, so long as his conduct is strictly tied to and justified by the circumstances which rendered its initiation permissible. . . . Determination of the means that are reasonably necessary to maintain the status quo necessarily depends on a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal security of a suspect." (Citations omitted; internal quotation marks omitted.) *State* v. *Braxton,* 196 Conn. 685, 689, 495 A.2d 273 (1985); see also *State* v. *Whitfield,* 26 Conn. App. 103, 112, 599 A.2d 21 (1991).

The defendant claims that the investigatory stop became constitutionally infirm and more intrusive than was necessary to complete the investigation for which the stop was made because the police (1) removed her and the other suspects from the vehicle at gunpoint, (2) searched the vehicle, her and the other suspects twice, (3) handcuffed her and the other suspects and placed them in the back of police cruisers, and (4)

detained her and the other suspects for an hour before identifications necessary for the probable cause to arrest her could be made. The defendant conceded at oral argument that all of the foregoing factors standing alone are under certain circumstances permissible pursuant to a valid *Terry* stop. See *State* v. *Wylie*, 10 Conn. App. 683, 687–88, 525 A.2d 528, cert. denied, 204 Conn. 807, 528 A.2d 1154 (1987) (mere fact that officers removed defendant and other suspects from vehicle at gunpoint does not automatically convert *Terry* stop into arrest); *State* v. *Holloman*, 20 Conn. App. 521, 526, 568 A.2d 1052, cert. denied, 214 Conn. 805, 573 A.2d 317 (1990) (permissible in course of *Terry* stop for officers to have revolvers drawn when ordering occupants out of car where report of occupants involved in armed robbery in which handgun stolen); *State* v. *Williams*, 157 Conn. 114, 118, 249 A.2d 245 (1968), cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1969) (as matter of common law, when officer justified in believing that individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to officer or others, it would be clearly unreasonable to deny officer power to take necessary measures to determine whether person is in fact carrying weapon and to neutralize threat of physical harm); *State* v. *Kyles*, 221 Conn. 643, 660–61, 607 A.2d 355 (1992), citing *Terry* v. *Ohio*, supra, 382 U.S. 1, and *Michigan* v. *Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983) (officers justified in conducting frisk of suspect to determine if person is carrying weapon if officers reasonably believe suspect may be armed and dangerous, and authorized to conduct search of passenger area for weapons); *State* v. *Braxton*, supra, 196 Conn. 689–90 (officer who has articulable grounds to believe that crime has been committed and to detain someone who may be implicated in crime must be permitted to make reasonable use of resources at disposal

at site of investigatory stop); *State* v. *Mitchell,* supra, 204 Conn. 198, citing *United States* v. *Sharpe,* 470 U.S. 675, 686–88, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (no specific time limit on investigative stops); see also 4 W. LaFave, Search and Seizure (3d Ed. 1996) § 9.2 (d), pp. 34–42. The defendant argues, however, that the cumulative effect of all these factors changed a valid *Terry* stop into an unconstitutional intrusion on the defendant's rights.

The proper way to identify the limits of an investigatory stop is to balance the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion. *State* v. *Mitchell,* 7 Conn. App. 46, 60, 507 A.2d 1017 (1986), rev'd on other grounds, 204 Conn. 187, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987), citing *United States* v. *Hensley,* 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 604 (1985); see also *United States* v. *Sokolow,* 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (rejecting "least intrusive means" test for *Terry* stop). Applying this balancing test, we conclude that the scope of the investigative stop of the defendant was reasonable under all of the circumstances. The police made the stop of the vehicle on a report that the defendant and the other occupants may have been involved in a shooting in Vernon. The nature, seriousness and recency of the crimes in this case dictated the need for a continued detention of the defendant and the other suspects. The officers' actions took into account the safety of the public as well as of themselves. They limited their searches of the defendant and the passenger compartment of the vehicle to searches for weapons. Finally, they acted diligently to pursue a means of investigation, namely, the display of the defendant to six possible witnesses, which was likely to confirm or dispel their suspicion quickly. "[D]etaining a suspect to effectuate a viewing by wit-

nesses to a crime has been deemed to be a permissible investigative technique." *State* v. *Mitchell*, supra, 204 Conn. 199. In this case, the investigation obviously required the continued detention of the defendant. Accordingly, the one hour that elapsed from the time of the shooting until probable cause arose for the defendant's arrest was reasonable under all the circumstances.

We conclude that, under the circumstances of this case, the actions of the police officers did not exceed the permissible limits of an investigative detention under *Terry* and that the defendant's motion to suppress was properly denied.

## II

The defendant claims next that the trial court improperly denied her motion to suppress the witnesses' out-of-court identifications of her because they were unnecessarily suggestive and unreliable. The trial court ruled that the procedure used by the police in this case, though suggestive, was not unnecessarily or impermissibly suggestive, and on the basis of the totality of the circumstances that the identifications were, nevertheless, reliable.

To determine whether an identification procedure violated a defendant's due process rights, "the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and, second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the 'totality of the circumstances.' " *State* v. *Theriault*, 182 Conn. 366, 371–72, 438 A.2d 432 (1980). "The standard by which we review a trial court's decision to admit evidence of identifications is well settled. [W]e will reverse the trial court's ruling only where there is abuse of discretion or where

an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 155, 665 A.2d 63 (1995). To prevail on her claim, the defendant must demonstrate that the trial court improperly ruled on both of its determinations regarding suggestiveness and reliability of identifications under the totality of the circumstances. *State* v. *Wooten*, 227 Conn. 677, 685, 631 A.2d 271 (1993).

We first address the defendant's claim that the identification procedure was unnecessarily suggestive. The defendant contends that because she and the other suspects were standing in a line-up, handcuffed behind their backs, surrounded by police officers and police cruisers and next to the Beretta in which they were stopped, the show-up identification procedure was unnecessarily suggestive. She also contends that this suggestiveness was heightened when Vitale was told by the Vernon police officers on the way to the identification scene that the South Windsor police were detaining four black persons who had been stopped in a blue-green Chevrolet Beretta and who were suspected of shooting Michaud. The state does not dispute that the identification was suggestive. See *State* v. *Collette*, 199 Conn. 308, 310, 507 A.2d 99 (1986); *Williams* v. *Bronson*, 21 Conn. App. 260, 264, 573 A.2d 330 (1990). The state contends, however, that the trial court correctly decided that the identification process, although suggestive, was not unnecessarily so.

"An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." *State* v. *White*, 229 Conn. 125, 161–62, 640 A.2d 572 (1994). Here, " 'the exigencies of the situation justified the [identification] procedure.' " *State* v. *Wooten*, supra, 227 Conn. 686. We conclude, therefore, that the trial court did not abuse its

discretion in finding that the identification procedure, though suggestive, was not unnecessarily so.[6]

Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[6] In any event, the trial court properly determined that the identification procedure was reliable. The following factors are to be considered in determining the reliability of an identification procedure: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *State* v. *Howard,* 221 Conn. 447, 453, 604 A.2d 1294 (1992), citing *Mason* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). "Because the issue of the reliability of an identification involves the constitutional rights of an accused, [however] we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Figueroa,* supra, 235 Conn. 155; *State* v. *Johnson,* 22 Conn. App. 477, 482–83, 578 A.2d 1085, cert. denied, 216 Conn. 817, 580 A.2d 63 (1990). In this case, the trial court considered the witnesses' degree of attention during the roadside show-up, the accuracy of their prior descriptions, their levels of certainty, and the length of time between the crimes and the identifications. We are satisfied after our thorough review of the record that the trial court correctly concluded that the identification procedure was reliable under the totality of the circumstances.