# STATE OF CONNECTICUT *v.* CARLOS ORTIZ
## (AC 17102)

Foti, Lavery and Hennessy, Js.

Argued October 27—officially released December 23, 1997

*M. Donald Cardwell,* for the appellant (defendant).

*Ellen A. Jawitz,* deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Stephen Preleski,* senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, Carlos Ortiz, appeals from the judgment, rendered after a jury trial, convicting him of murder as an accessory in violation of General Statutes §§ 53a-54a[1] and 53a-8,[2] and conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[3] and 53a-54a. On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress statements and physical evidence, (2) denied his

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

motion to suppress an out-of-court identification, (3) charged the jury on accessorial liability, and (4) marshaled the evidence in favor of the state during its charge to the jury. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 8, 1993, at approximately 8 p.m., Arnette Harrison was riding his bicycle on Retreat Avenue in Hartford when he noticed Angel Ortiz walking toward him. Harrison saw a man run from behind Angel and shoot him. As the man began to shoot at Angel, Harrison fell off his bicycle and hid behind a car and watched the shooter, afraid that he would be shot next. The shooter looked directly at Harrison and then ran up the street and entered the passenger side of a truck. The truck proceeded down the street slowly toward Harrison, who continued hiding behind the car and watching the truck. When the truck reached the spot where Harrison hid, the driver looked directly at Harrison. Harrison recognized the driver as a man by the name of Carlos Ortiz, the defendant, whom he had seen before on a few occasions. After the truck passed, Harrison stepped into the street to attempt to see the license plate number. Harrison further testified that the area was well lit and that, when the truck drove past, he was fifteen to twenty feet away. At trial, Harrison identified the defendant as the driver of the truck. Harrison was able to observe that the truck was a red, orange or brown Subaru-type truck with a white stripe down the side and a rust spot on the driver's side behind the door. He noted that the license number was "WC, WE, NC or NE, something like that, and four numbers."

At approximately 8:05 p.m., police arrived at the scene and within minutes broadcast a description of the truck and the direction of travel it was last seen headed. The victim was rushed to the hospital, where

he was pronounced dead as the result of gunshot wounds to the chest and arm.

Within minutes of the broadcast, the police located a small red pickup truck with an orange stripe in the nearby Dutch Point housing project. The responding officers followed the truck as it proceeded in the wrong direction on a one-way street and blocked it with their cruiser after it backed into a parking space. Following standard operating procedures when a vehicle is suspected of being involved in a felony and the possibility of confrontation exists, the officers took up positions behind the open doors of their cruiser and ordered the two men out of the truck. The officers did not draw their weapons. The two occupants exited. Again, following standard procedure, the officers ordered the men to lean spread-eagle over the hood of the truck and conducted a pat-down search of the passenger, later identified as the defendant, and the driver, later identified as Marcus Maldonado. The officers also conducted a protective search of the truck. Neither the search of the suspects nor that of the truck revealed any weapons. The license plate of the truck was NC 5808. No description of the license number or identification of the occupants was made during the broadcast.

Approximately twenty-five minutes after the shooting, the police brought Harrison and three other witnesses to Dutch Point to view the truck. All four men identified the truck as the vehicle involved in the shooting. Harrison identified the defendant as the driver, and Maldonado as the shooter. Another witness who had seen the shooting, Marcus Henry, identified Maldonado, on the basis of his clothing, as the shooter. Following those identifications, Maldonado and the defendant were arrested.

A search of the area failed to locate the murder weapon. Atomic absorption tests performed on the

defendant and Maldonado revealed the presence of elements characteristic of gunshot residue. Maldonado's shirt and coat cuffs, and the thigh area of his pants all tested positive for gunshot residue. Atomic absorption tests performed on the outside door handle, inside door handle, seat, dashboard area, window crank, molding, and armrest on the passenger side of the truck revealed elements characteristic of gunshot residue.

The defendant told the police that he had been a passenger in a truck with Maldonado when it was stopped at Dutch Point. The defendant also stated that shortly before they were stopped, he had gone to Retreat Avenue to ask his mother for money.

I

The defendant first claims that the trial court improperly denied his motion to suppress physical evidence seized from the truck and his person, and statements he made to the police on the ground that such evidence was the fruit of a de facto illegal arrest. We disagree.

A

The defendant argues that the results of the atomic absorption test performed on the passenger side of the truck should have been suppressed. In connection with the motion, the parties stipulated that the defendant was a passenger in the vehicle when it was stopped. The evidence also revealed that Maldonado was the owner of the truck. The trial court ruled that the defendant lacked standing to challenge the search of the truck.

In order to challenge a search or seizure on fourth amendment grounds, a defendant must show that he has a reasonable expectation of privacy in the place searched. See *Rakas* v. *Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). "A passenger in a motor vehicle, who fails to demonstrate a possessory interest

in the car itself or in any of the seized evidence, has no reasonable expectation of privacy in the area of the vehicle searched, and thus, he is precluded from contesting the validity of the search." (Internal quotation marks omitted.) *State* v. *Burns*, 23 Conn. App. 602, 611–12, 583 A.2d 1296 (1990). We agree with the trial court that the defendant did not have standing to challenge the search of the vehicle because he had no reasonable expectation of privacy regarding the search of Maldonado's truck.

B

The defendant next argues that the results of the atomic absorption test done on his person and the statements he made to the police were obtained as the result of an unlawful arrest. The defendant concedes that sufficient articulable grounds existed for the police initially to stop the truck, on the basis of the description of the vehicle in which he was a passenger, to investigate whether he was involved in the shooting death of Angel Ortiz. The defendant argues that the detention was unconstitutional in that it exceeded the permissible scope of any investigative detention. As a result, the defendant argues that evidence seized and statements made should be suppressed as fruit of the poisonous tree.

The trial court ruled that the officers had a reasonable suspicion to stop the truck and, once the truck was detained, the police had the right to detain the occupants to allow a one-on-one identification while the witnesses' memories were fresh. The trial court then concluded that the detention in this case was reasonable and did not constitute a de facto arrest without probable cause.

Where the defendant concedes that the initial stop was proper pursuant to *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), we need not address

the propriety of the initial stop. *State* v. *Casey*, 45 Conn.
App. 32, 40, 692 A.2d 1312, cert. denied, 241 Conn. 924,
697 A.2d 360 (1997); *State* v. *Bowden*, 15 Conn. App.
539, 543–44, 545 A.2d 591, cert. denied, 209 Conn. 810,
548 A.2d 438 (1988).

"One function of a constitutionally permissible *Terry*
stop is to maintain the status quo for a brief period of
time to enable the police to investigate a suspected
crime. A police officer who has proper grounds for
stopping a suspect has constitutional permission to
immobilize the suspect briefly in order to check a
description or an identification, so long as his conduct
is strictly tied to and justified by the circumstances
which rendered its initiation permissible." (Internal
quotation marks omitted.) *State* v. *Braxton*, 196 Conn.
685, 689, 495 A.2d 273 (1985). "A *Terry* stop that is
justified at its inception can become constitutionally
infirm if it lasts longer or becomes more intrusive than
necessary to complete the investigation for which that
stop was made." *State* v. *Mitchell*, 204 Conn. 187, 197,
527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293,
98 L. Ed. 2d 252 (1987).

This court recently considered and rejected a claim
almost identical to the one raised by the defendant in
this appeal. *State* v. *Casey*, supra, 45 Conn. App. 32. In
*Casey*, police officers spotted a vehicle that matched
the description of a vehicle driven by three suspects in
a recent shooting. The officers pulled the car over and
waited for backup. When backup arrived, the police
executed a high risk felony stop.[4] The suspects were

---

[4] The police "ordered the defendant and the other suspects out of the
Beretta one at a time with their hands on their heads. When they were
outside of the vehicle, Russotto told them to place their hands on the roof
of the car and to turn completely around and walk backward toward Martin.
Russotto then directed each of them to kneel on the ground. Martin hand-
cuffed and frisked the defendant and the other suspects and then placed
them in one of two police vehicles. . . . All five officers had their guns
drawn during this procedure, which lasted approximately ten minutes. . . .

detained until six witnesses, who subsequently identified the defendant, could be brought to the scene.

"The proper way to identify the limits of an investigatory stop is to balance the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." Id., 43. After applying this balancing test, we conclude that the scope of the investigative stop of the defendant was reasonable under all of the circumstances. As in *Casey*, the police officers in this case "made the stop of the vehicle on a report that the defendant and the other [occupant] may have been involved in a shooting [less than a mile away]. The nature, seriousness and recency of the [crime] in this case dictated the need for a continued detention of the defendant and the other [suspect]. The officers' actions took into account the safety of the public as well as of themselves. They limited their searches of the defendant and the passenger compartment of the vehicle to searches for weapons. Finally, they acted diligently to pursue a means of investigation, namely, the display of the defendant to [four] possible witnesses, which was likely to confirm or dispel their suspicion quickly." Id. The detention in this case differs from that in *Casey*. In *Casey*, the police had drawn their weapons whereas the police in this case did not, and the time between the shooting and the identification here was twenty-five minutes, whereas in *Casey* there was a one hour delay.

The officers then checked the Beretta's driver and passenger areas for weapons and opened the trunk for the sole purpose of ensuring that no other person was hiding in it. While searching the backseat of the Beretta, Russotto discovered a lock-blade knife. Audette and Martin searched the driver and passenger areas a second time to ensure that other weapons had not been overlooked. During this search, Martin found a .22 caliber shell casing. After this discovery, the officers removed the defendant and the other suspects from the police cruisers and frisked them a second time for weapons. None was found." *State* v. *Casey*, supra, 45 Conn. App. 37–38 (omitting footnote explaining that female defendant not frisked as thoroughly as male suspects due to local police regulations).

We conclude that, under the circumstances of this case, the actions of the police officers did not exceed the permissible limits of an investigative detention under *Terry* and that the defendant's motion to suppress was properly denied.

## II

The defendant next claims that the trial court improperly denied his motion to suppress the out-of-court identification of him by Harrison. The defendant contends that the procedure used to identify him was so impermissibly suggestive as to give rise to a very substantial likelihood of an irreparable misidentification. The defendant did not raise this claim at trial[5] and can prevail only if the claim meets the conditions set out in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. . . . The defendant bears the responsibility for providing a record that is

---

[5] At trial, during the defendant's argument on the motion to suppress physical evidence, the defendant's counsel conceded that this particular motion did not encompass a motion to suppress the identification of the defendant. Counsel stated: "I filed a motion to strike the identification with a separate memorandum of law . . . ." Our review of the record, trial file and transcripts fail to locate the motion to strike and accompanying memorandum of law. In addition, there is nothing before this court that shows that the trial court ever rendered a decision on that motion to strike.

adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." Id. We conclude that the defendant has failed to provide an adequate record to review this claim and thus fails to satisfy the first prong of *Golding*.

"[I]n determining whether a pretrial identification procedure violated a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail in his claim the defendant must demonstrate that the trial court erred in *both* of its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wooten*, 227 Conn. 677, 685, 631 A.2d 271 (1993).

Resolution of these questions requires the fact-finding function of the trial court. "The 'totality of circumstances,' by necessity, requires the determination of a number of factors used to test the reliability of the out-of-court identification. . . . Without the necessary factual and legal conclusions [on reliability] furnished by the trial court, we would be left to speculate." (Citations omitted.) *State* v. *Crosby*, 36 Conn. App. 805, 819–20, 654 A.2d 371, cert. denied, 232 Conn. 921, 656 A.2d 669 (1995).

Neither a written memorandum of decision nor a transcript signed by the trial court presiding at a sup-

pression hearing on this matter exists in the record. The record contains no evidence indicating that the trial court addressed the defendant's claim. Because no findings are available for our review, we will not review the unpreserved claim.

## III

The defendant next contends that the trial court improperly charged the jury regarding the crime of accessory to commit murder.[6] Specifically, the defendant claims that the trial court failed to make it clear

---

[6] The trial court's instruction on accessorial liability stated in relevant part: "A person acting with the mental state required for a commission of an offense who intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct. Now I've already defined intent as to murder and that same meaning may be applied to this statute. Now, it's not enough for the defendant—or that the defendant committed acts which may in fact have aided the committing of the criminal act. One who is present when a crime is committed, but neither assists in the commission nor shares in the criminal intent cannot be convicted as an accessory. Mere presence is not enough, nor passive acquiescence. To be an accessory, the defendant must have criminal intent and unlawful purpose with the one who did the criminal act. The question before you then is did the defendant intend to aid the shooter, Mr. Maldonado, and in so doing did he intend to have the crime of murder committed by the shooter, Mr. Maldonado. Or place a question to the factual situation. Was he prepared to drive the shooter away from the scene of the crime? Now, the nature of the evidence to consider here is the testimony of Arnette Harrison, who testified that he saw the defendant in the driver's seat of the truck that drove east on Retreat Avenue after the shooter crossed the street from the shooting and got into the passenger seat. Both the shooter and the defendant were identified by Mr. Harrison within twenty minutes at Dutch Point after Trooper [Michael] Nocunas had stopped them and—in a truck which was identified by Arnette Harrison as the truck which he saw leaving the scene of the shooting on Retreat Avenue. You may also take into consideration the nature of Trooper Nocunas' testimony concerning the fact that Mr. Maldonado was driving the truck at the time it was stopped and that the defendant was a passenger. And that of Officer Winslow, who testified that the truck was owned by Mr. Maldonado. If you find that the state has proved that the defendant intended to aid the shooter, Mr. Maldonado, and in so doing did intend to have the crime of murder committed, then you must find him guilty of this first count. On the other hand, if the state has failed to prove to you beyond a reasonable doubt that element then you must find him not guilty."

to the jurors that they had to find the same intent to commit the crime of murder for one charged with accessory to commit murder. Also, the defendant claims that the trial court misled the jury in its charge when it stated, "Was he prepared to drive the shooter away from the scene of the crime?" The defendant contends that this comment suggested that he could be convicted if the jury found that he intentionally aided the shooter by driving him away from the scene of the crime and nothing more.

The standard of review for an improper instruction on an element of an offense is whether it is reasonably possible that the jury was misled. *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995); *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994). "In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. *State* v. *Estep*, 186 Conn. 648, 651–52, 443 A.2d 483 (1982); *State* v. *Harris*, 172 Conn. 223, 226, 374 A.2d 203 (1977); *Farlow* v. *Connecticut Co.*, 147 Conn. 644, 648, 166 A.2d 202 (1960); *Amato* v. *Desenti*, 117 Conn. 612, 617, 169 A. 611 (1933). The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Reed*, 174 Conn. 287, 305, 386 A.2d 243 (1978); *State* v. *Holmquist*, 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977). The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. *State* v. *Roy*, 173 Conn. 35, 40, 376 A.2d 391 (1977); *State* v. *Mullings*, 166 Conn. 268, 274–75, 348 A.2d 645 (1974).

. . . *State* v. *Ash,* supra, 493–94, quoting *State* v. *Dyson,* 217 Conn. 498, 501–502, 586 A.2d 610 (1991)." (Internal quotation marks omitted.) *State* v. *Prioleau,* supra, 284–85. " 'The charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict.' " *State* v. *Ash,* supra, 494.

After the trial court instructed the jury, the defendant took exception to the statement, "Was the defendant prepared to drive the shooter away," on the ground that it ignored the necessary element of intent to kill the victim. During deliberations, the jury requested that the trial court "reiterate in summary format how the murder charge encompasses anyone who is an accessory." The trial court gave a supplemental charge, and the defendant took an exception to that for the same reason as previously.[7]

To be found guilty of accessorial liability under § 53a-8, "this statute requires proof of a dual intent: that the accessory have the intent to *aid* the principal *and* that in so aiding he intend to *commit* the offense with which he is charged. (Emphasis in original.) *State* v. *Harrison,* 178 Conn. 689, 694, 425 A.2d 111 (1979); *State* v. *Nardini,* 187 Conn. 513, 531, 447 A.2d 396 (1982)." (Internal quotation marks omitted.) *State* v. *Fleming,* 198 Conn.

---

[7] The supplemental charge stated in relevant part: "A person acting with the mental state required for the commission of an offense—that is, murder—who intentionally aids another person to engage in conduct which constitutes the offense—being murder—shall be criminally liable for such conduct. To be an accessory, the defendant must have criminal intent and community of unlawful purpose with the one who did the criminal act. The question before you then is, did the defendant intend to aid the shooter and in so doing did he intend to have the crime of murder committed by the shooter? Now, applying this principle to the evidence in this case, the question before you is, did the defendant intend to aid the shooter in the crime of murder by being prepared to drive the shooter away after the shooter committed the crime of murder, which crime the defendant intended was to be done by the shooter?"

255, 271, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986). For the jury to convict this defendant on an accessorial theory, it had to find that the defendant was an accessory to the underlying crime of murder. Accordingly, the jury had to find that he intended both to aid the principal *and* to commit the underlying felony of murder.

After reviewing the entire charge, we conclude that the court's charge correctly instructed the jury on the intent necessary to support a conviction as an accessory under § 53a-8. The court initially tracked the language of § 53a-8 in its accessory instruction to the jury. It explained that merely aiding the principal in the commission of the crime or being present when the crime was committed was insufficient to justify conviction, unless the defendant did so with criminal intent and community of unlawful purpose with the one who did commit the criminal act. The court twice correctly stated that the jury must find that the defendant intended to aid the shooter and that he did so with the intent that the shooter murder the victim, and again repeated that in its supplemental charge. We are satisfied that the instruction properly informed the jury of the necessary mental element for accessorial liability.

IV

The defendant's final claim is that the trial court unfairly marshaled the evidence in favor of the state. The defendant claims that the trial court improperly directed the jury's attention to the testimony favorable to the state and passed over or ignored testimony favorable to the defense. We disagree.

"In reviewing a claim that the court improperly commented on the evidence, we first note that [i]t has been established by repeated decisions in this State that a

court, in submitting a case to the jury, may, at its discretion, call the attention of the jury to the evidence, or lack of evidence, bearing upon any point of evidence in issue in the case, and may comment upon the weight of the evidence, so long as it does not direct or advise the jury how to decide the matter . . . . The ultimate test of the charge is whether, read in its entirety, it fairly presents the case to the jury so that no injustice is done . . . . Individual comments are not to be judged in isolation from the charge as a whole . . . and should be examined not in a vacuum, but in the context of the factual issues raised at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Fenn*, 16 Conn. App. 318, 329–30, 547 A.2d 576, cert. denied, 209 Conn. 822, 551 A.2d 757 (1988), cert. denied, 488 U.S. 1031, 109 S. Ct. 841, 102 L. Ed. 2d 973 (1989).

The defendant contends that the trial court in instructing the jury (1) minimized the fact that two of the state's witnesses had criminal records, (2) mischaracterized the testimony of one of the state's witnesses so as improperly to affirm the testimony, (3) discussed only the evidence that corroborated Harrison's identification, (4) discussed only the evidence that supported a finding that a conspiracy existed, and (5) improperly instructed the jury on accessorial liability.

Having reviewed the instructions, we note that the trial court repeatedly informed the jury that it was the sole finder of fact, that it was to reach a verdict "by applying the facts as you determine them to the law as I will give it to you," that it was to determine the credibility of the witnesses, and stressed that the court's reference to certain evidence was only for illustration.[8] We

---

[8] The trial court's instruction provided in relevant part: "Now I have referred to evidence only to illustrate my instruction of the law. I have not meant to emphasize certain evidence nor to avoid the mention of other evidence. You must consider all the evidence. And where your recollection differs from mine, remember it's your recollection and memory of the evidence that controls."

find that the court's instruction properly presented the case to the jury so that no injustice was done.

The judgment is affirmed.

In this opinion the other judges concurred.