STATE OF CONNECTICUT *v.* TERRELL K. KIMBLE
(AC 26992)

Bishop, Harper and Peters, Js.

Argued October 15, 2007—officially released March 25, 2008

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, former state's attorney, and *Donna Mambrino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Terrell K. Kimble, appeals from the judgment of conviction following his conditional plea of nolo contendere[1] to criminal possession

[1] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a

of a firearm in violation of General Statutes § 53a-217 and interfering with an officer in violation of General Statutes § 53a-167a. The defendant also pleaded guilty under the *Alford* doctrine[2] to assault in the first degree in violation of General Statutes § 53a-59, robbery in the first degree in violation of General Statutes § 53a-134, and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134.[3] The plea of nolo contendere to the criminal possession of a firearm charge followed the trial court's denial of the defendant's motion to suppress evidence, specifically, the gun that was integral to that charge.[4] The defendant challenges the court's denial of his motion to suppress on two grounds. First, the defendant claims that the court improperly concluded that he lacked standing to challenge, under the federal and state constitutions, the legality of an alleged warrantless search of an automobile in which he was a passenger. Second, the defendant claims that the court improperly rejected his claim that the gun, found by police in the automobile,

trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[2] See *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[3] The court sentenced the defendant to a total effective term of incarceration of twenty years, suspended after twelve years. The charges for which the defendant entered a plea of nolo contendere arose separately from the charges for which he entered a plea under the *Alford* doctrine. Each set of charges was brought under separate informations and separate docket numbers, which the court joined for trial prior to the date of the defendant's pleas. The claims raised by the defendant in this appeal relate solely to his conviction of criminal possession of a firearm.

[4] The court determined that its denial of the motion to suppress was dispositive of the possession count only. Accordingly, the possession count is the only count from which the defendant properly has exercised his right of appeal and the only count at issue in this appeal. See General Statutes § 54-94a.

was the fruit of police illegality, namely, an illegal investigative detention. We affirm the judgment of the trial court.

The defendant filed a written motion to suppress on April 22, 2005. At the suppression hearing, the state presented testimony from Leonard Grissette, a Hartford police officer who was on duty during the evening hours of March 10, 2004. Grissette testified to the following facts. At approximately 10 p.m., he received a transmission from the police department dispatcher directing him to investigate a report that two black males, in an automobile with New York marker plates, were selling drugs at a parking lot located at 7 Harold Street. Grissette did not know anything about the person or persons who reported this information to the police. When he arrived at the location specified, he observed two black males sitting in a Chevrolet Impala, with New York marker plates, parked in the parking lot of a multifamily home. There were other cars parked in the area, and Grissette parked his marked police cruiser on the street in front of 7 Harold Street. Grissette did not observe the individuals doing anything in the vehicle. He did not observe anyone approach the vehicle or any conduct that was indicative of drug activity.

Grissette, dressed in a police uniform, approached the automobile "[j]ust to see what was going on." He asked the driver to open his window and asked the occupants: "Do either one of you live here?" Both men replied that they did not. Grissette then asked the driver if he had any identification. The driver replied that he did not have any identification on him. Grissette then asked the driver for his name and date of birth. After hesitating, the driver provided a name and date of birth. Grissette radioed this information to a police operator who informed Grissette that the information did not yield any records. Grissette asked the driver if he was sure about the information, to which the driver provided

a different date of birth. After Grissette radioed this information to the police operator, he was informed a second time that it did not yield any records.

Grissette testified that he then turned his attention to the defendant, who was sitting in the passenger seat of the automobile. He asked the defendant to provide his name and date of birth. The defendant did so without hesitation. After a second police officer arrived on the scene shortly thereafter, the defendant exited the automobile and began running from it. After a brief foot pursuit, Grissette restrained the defendant and put him in handcuffs. Subsequently, Grissette placed the defendant under arrest for the crimes of "criminal trespass . . . and interfering" and seated him in a police cruiser. Later, another officer at the scene likewise arrested the driver of the vehicle and seated him in a police cruiser. While both the defendant and the driver were seated in the cruisers at the scene, two police officers began to search their automobile. One of the officers, Michael Francis, drew Grissette's attention to the passenger side of the automobile where a small handgun was lying on the floorboard "between the seat and the seatbelt housing," near the automobile's passenger door, which had been left open. Although Grissette had not observed the gun until this time, it was plainly visible; nothing had to be moved for Grissette to observe it. Later, Grissette learned that the driver had not provided his real name to him at the scene and that the automobile at issue was owned by an automobile rental company.

The state also presented testimony from Francis, who testified to the following relevant facts. At shortly after 10 p.m., after learning that a fellow officer was in pursuit of a subject, he arrived on the scene. He knew no other information about either Grissette's activities or the defendant. Upon his arrival at the scene, he observed Grissette walking the defendant, in handcuffs, toward an automobile parked at the scene. Upon learning that

both subjects had been arrested and detained, Francis assisted another officer at the scene, who had begun searching the driver's side of the automobile. Francis approached the passenger side of the automobile where he observed that the passenger door was open and immediately observed a firearm that was between "the passenger front seat and the door open area on the floor of the vehicle." His subsequent search of the vehicle did not yield any additional evidence.

For the purpose of establishing standing, the defendant testified at the suppression hearing that at the place and time in question, he was the owner of and in possession of the .25 caliber gun seized by the police. The defendant acknowledged that he did not have a permit for the gun. The defendant corroborated the testimony of the police officers as to the gun's location inside the automobile at the time the police detected it, testifying that he had the gun on the floor between the door and the passenger's seat, where he had been sitting.

The state argued that the seizure of the defendant was lawful because, on the basis of the facts presented, Grissette had a reasonable and articulable suspicion sufficient to justify an investigatory stop of the defendant and the driver. The state also asserted that the gun was discovered in plain view from a vantage point that the officers had a lawful right to occupy. The state challenged the defendant's standing to contest the legality of any search of the automobile, arguing that the defendant did not have an ownership interest or expectation of privacy in the automobile. The state likewise asserted that the defendant had abandoned the gun and, thus, did not have any expectation of privacy with regard to the gun, when he fled from the automobile. The defendant argued that the seizure of the gun stemmed from police illegality in that the police lacked

a reasonable and articulable suspicion to have conducted an investigatory stop and that Grissette had conducted an investigatory stop when he approached the automobile to talk with the defendant and the driver.

In an oral ruling, the court denied the defendant's motion to suppress.[5] The court reasoned that the defendant lacked standing to challenge the validity of the search of the rented automobile because he was merely a passenger in the automobile and lacked any possessory interest in it. The court went on to rule that, if standing existed, it would deny the motion on its merits. The court found that the anonymous tip was not corroborated by any evidence of drug activity. Nonetheless, the court was persuaded by its finding that the automobile was parked on private property, near a residence, and the defendant did not have a right to be at that place unless he had "some connection . . . with the premises." The court deemed it relevant that the defendant had been charged at the scene with, inter alia, criminal trespass. The court concluded that, under these circumstances, Grissette lawfully had conducted "an identity check" of the driver and the defendant.

The court's findings reflect its reliance on the largely unchallenged testimony of Grissette and Francis. The court accepted as true Grissette's testimony that the defendant fled from the vehicle in the manner that Grissette described. The court also accepted as true Francis' testimony that the gun was found in the automobile in the manner described, via the automobile's open passenger door. On the basis of these findings, the court concluded that the police had detected the gun in "plain sight" upon approaching the automobile after the defendant was apprehended. Summarizing its ruling, the court stated: "[T]he motion is denied for no standing.

---

[5] The court subsequently signed a transcript of its ruling, thereby bringing its decision into compliance with Practice Book § 64-1.

The investigative stop was reasonable given the fact that the vehicle with New York plates was parked on private property and the weapon that was seized was in plain view so that a search was not in reality conducted."

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . ." (Internal quotation marks omitted.) *State* v. *Jones*, 281 Conn. 613, 654, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007). "Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights . . . we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

I

First, the defendant claims that the court improperly concluded that he lacked standing, under the federal and state constitutions, to challenge the legality of the warrantless search of the automobile in which he was a passenger.[6] We disagree.

[6] In his principal appellate brief, the defendant asserted and fully analyzed his claim that the constitution of Connecticut "provides automatic standing to challenge the seizure of possessions in a case involving a possessory

The court resolved the standing issue adverse to the defendant, yet separately concluded that a search related to the discovery of the gun was not conducted because the gun was detected in plain view by the police. At the outset, we note that the defendant does not challenge the correctness of this plain view determination. "[O]nly an intrusion into an area in which an individual has a reasonable expectation of privacy, with the specific intent of discovering evidence of a crime, constitutes a search within the meaning of the fourth and fourteenth amendments. . . . A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest. . . . The term connotes hostility between the searcher and the person whose property or possessions are being searched. . . . The analysis which focuses on the intent, purpose and motivation of the intrusion vis-a-vis the criminal investigatory function of a policeman is reflected somewhat in [the definition of search] as any intrusion . . . by an officer, under the color of authority, upon an individual's . . . property . . . for the purpose of seizing . . . things." (Citations omitted; internal quotation marks omitted.) *State* v. *Tully*, 166 Conn. 126, 131–32, 348 A.2d 603 (1974); *State* v. *MacNeil*, 28 Conn. App. 508, 517, 613 A.2d 296, cert. denied,

offense." In its appellate brief, the state disagreed with this claim. Subsequent to the filing of the parties' appellate briefs, our Supreme Court released *State* v. *Davis*, 283 Conn. 280, 929 A.2d 278 (2007). By letter, prior to the time of oral argument before this court, we invited the parties to be prepared to discuss the impact, if any, of *Davis* on the issue of standing in this case. During oral argument, the parties were in agreement that *Davis* was controlling and was adverse to the defendant's claim that the constitution of Connecticut embodied the principle of automatic standing. We agree that *Davis* is dispositive of this state constitutional claim and, in reliance thereupon, we reject without further discussion the automatic standing aspect of the defendant's claim and will analyze the issue of standing under the proper principles of law.

224 Conn. 901, 615 A.2d 1044 (1992). "Under the state constitution, all warrantless searches, whether or not the police have probable cause to believe that a crime was committed, are per se unreasonable, unless they fall within one of a few specifically established and well delineated exceptions to the warrant requirement." *State* v. *Joyce*, 229 Conn. 10, 24–25, 639 A.2d 1007 (1994), on appeal after remand, 243 Conn. 282, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

Courts have questioned " 'whether it serves any useful analytical purpose to consider [the] principle [that fourth amendment rights are personal] a matter of standing, distinct from the merits of a defendant's [f]ourth [a]mendment claim' . . . [and have concluded] that the 'definition of [fourth amendment] rights is more properly placed within the purview of substantive [f]ourth [a]mendment law than within that of standing.' " (Citation omitted.) *State* v. *Davis*, 283 Conn. 280, 299, 929 A.2d 278 (2007), quoting *Rakas* v. *Illinois*, 439 U.S. 128, 138–40, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). Generally, to assert that a search was constitutionally impermissible, a defendant must demonstrate that he possessed a reasonable expectation of privacy in the area searched. A proper determination that an item has been detected by police in plain view, however, obviates the need for any further inquiry into whether a privacy interest has been invaded.

"As the United States Supreme Court stated in *Illinois* v. *Andreas*, 463 U.S. 765, 772, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983), [t]he plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy. . . . [I]f contraband is left in open view and is observed by a police officer from a lawful vantage

point, there has been no invasion of a legitimate expectation of privacy and thus no search within the meaning of the [f]ourth [a]mendment—or at least no search independent of the initial intrusion that gave the officers their vantage point. . . .

"Under the plain view doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 520–21, 903 A.2d 169 (2006). In light of the court's unchallenged determination that the police detected the gun in plain view upon approach to the open passenger door of the automobile, we conclude that no search in connection with the seizure of the gun occurred in the present case. Thus, the defendant cannot succeed on this claim.[7]

Even were we, as a matter of law, to conclude that the gun was seized incident to a search of the automobile, we would nonetheless conclude that the defendant lacked standing to challenge the legality of such police action. In determining whether a defendant has standing to challenge the legality of a search and seizure under both the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut, we employ the same analytical framework.[8] *State* v. *Davis*, supra, 283 Conn. 287–324 (rejecting claim that state constitution embodies rule of standing for purposes of search and seizure different

---

[7] Of course, a determination that an item has been detected in plain view, and not incident to a search, does not necessarily preclude a defendant from asserting successfully that such item should be suppressed as the fruit of police illegality.

[8] The use of the same analytical framework or methodology, however, does not necessarily dictate that the same outcome will be reached under both constitutions. See *State* v. *Joyce*, supra, 229 Conn. 18 n.12.

from that embodied in federal constitution). To meet this rule of standing, the defendant must demonstrate that he had a reasonable expectation of privacy in the area or subject of the search. See *Rakas* v. *Illinois*, supra, 439 U.S. 143; *State* v. *Joyce*, supra, 229 Conn. 20; *State* v. *DeFusco*, 224 Conn. 627, 633, 620 A.2d 746 (1993).

"The burden of proving the existence of a reasonable expectation of privacy rests on the defendant. . . . In order for the defendant to demonstrate that he had a reasonable expectation of privacy in the [subject of the search]: (1) he must have manifested a subjective expectation of privacy with respect to the [subject of the search]; and (2) that expectation must be one that society would consider reasonable." (Citations omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 278 Conn. 341, 349, 898 A.2d 149 (2006). "Absent such an expectation, the subsequent police action has no constitutional ramifications." (Internal quotation marks omitted.) *State* v. *Pink*, 274 Conn. 241, 258, 875 A.2d 447 (2005).

In the present case, the defendant testified that he owned the gun that was seized by the police and that he left it in the automobile where the police found it. In concluding that the defendant lacked standing to challenge the legality of that search, the court appears to have relied almost exclusively on its finding that the defendant had no possessory interest in the rented automobile in which he was a passenger. The defendant argues that, because he "admitted ownership" of the gun seized, "he retained a legitimate expectation of privacy as a passenger in the automobile, albeit a diminished one, which was infringed upon by the warrantless search."

In *State* v. *Davis*, supra, 283 Conn. 312–13, our Supreme Court stated: "The United States Supreme

Court held unequivocally in [*United States* v. *Salvucci*, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980)] that, under the fourth amendment, a defendant does not have automatic standing to challenge a search merely by virtue of having a possessory interest in the item seized. . . . Rather, defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own [f]ourth [a]mendment rights have . . . been violated. . . . In other words, a defendant may not invoke the fourth amendment to challenge the legality of a search unless he first can establish a legitimate expectation of privacy *in the area searched.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Passengers in an automobile, neither claiming nor demonstrating a possessory interest in the automobile, generally are regarded as lacking a reasonable expectation of privacy in the automobile. See *State* v. *Altrui*, 188 Conn. 161, 178–79, 448 A.2d 837 (1982); *State* v. *Thomas*, 98 Conn. App. 542, 550–51, 909 A.2d 969 (2006), cert. denied, 281 Conn. 910, 916 A.2d 53 (2007); *State* v. *Ortiz*, 47 Conn. App. 333, 337–38, 705 A.2d 554 (1997), cert. denied, 244 Conn. 902, 710 A.2d 175 (1998); *State* v. *Burns*, 23 Conn. App. 602, 611–12, 583 A.2d 1296 (1990); *State* v. *Manson*, 13 Conn. App. 220, 223, 535 A.2d 829 (1988).

Although a passenger's property interest in an item seized from an automobile may, in an appropriate case, bolster a claim that such passenger reasonably held an expectation of privacy in an area of an automobile, that is not the case before us. Here, it cannot reasonably be concluded from the facts found that the defendant manifested any subjective expectation of privacy in the area of the automobile where his gun was seized. The court found that the defendant fled the automobile and left the passenger door open behind him. The court also accepted as true Francis' testimony that, when he approached the open passenger door, the defendant's

gun was left in plain view against the passenger seat in the automobile. The defendant's claimed expectation of privacy is based on his ownership interest in the gun and nothing more. Compare *State* v. *Cooper*, 9 Conn. App. 15, 20–21, 514 A.2d 758 (1986) (concluding passenger had standing to challenge search of his coat locked in trunk of automobile searched by police). Thus, the court's conclusion that the defendant lacked standing to challenge the search of the automobile was supported by the facts found and was correct in law.

## II

Next, the defendant claims that the court improperly denied his motion to suppress after concluding that the seizure of the gun was not the fruit of an illegal investigative detention. We disagree.

The defendant argues that an investigative detention occurred and that he and the driver were thus seized "at the moment Officer Grissette approached" the automobile. In the alternative, the defendant argues that an investigative stop "had clearly started when, as Officer Grissette testified, the driver hesitated with his name and date of birth, and no information regarding that name and date of birth existed." As he did at trial, the defendant argues that police did not possess a reasonable and articulable suspicion that he was engaged in criminal activity at either of these times, that the seizure of the gun was the fruit of this police illegality and that the court should have granted his motion to suppress on this ground. In contrast, the state argues that the defendant was not seized "until he fled the car *and Grissette pursued him*." (Emphasis added.) The state argues that, at that point in time, the seizure of the defendant was amply supported by a reasonable and articulable suspicion of criminal activity. The state argues that police on the scene were thereafter legally

at a vantage point from which they detected the defendant's gun in plain view and that the seizure of the gun was not constitutionally infirm.

In its oral ruling, the court appears to have reasoned that because the defendant lacked standing to challenge the legality of any search of the automobile, it was unnecessary to resolve his challenge to the legality of any seizure of his person that preceded any search and, consequently, the admissibility of any evidence tainted by an illegal seizure. Nevertheless, the court addressed the issue of the defendant's seizure, concluding that "[t]he investigative stop was reasonable . . . ." The court, however, did not specify *when* such seizure occurred. We distinguish between any search of the automobile and any seizure of the defendant's person that preceded it that may have tainted such search. We already have concluded that police detected the gun in the automobile in plain view, not incident to a search. We also have concluded that, under these circumstances, the defendant has not demonstrated that the police violated a reasonable privacy interest in conjunction with any search of the automobile. Nonetheless, the defendant may challenge any seizure of his person as constitutionally unreasonable and attempt to demonstrate that the gun should be suppressed because it was tainted by police illegality in this regard.

In order to resolve the defendant's claim, we must determine when a seizure of the defendant occurred, whether it was constitutionally permissible and, if it was not, whether he correctly asserts that the evidence in question must be excluded as the fruit of an unlawful seizure.[9] The defendant has briefed this claim under

[9] "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . Application of the exclusionary rule, however, is not automatic. [E]vidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint. . . . [N]ot all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt

the fourth amendment to the federal constitution, as well as article first, § 7, of the Connecticut constitution.

## A

Our Supreme Court has interpreted our state charter of liberty as affording broader protection than its federal counterpart when determining whether an individual has been seized. See *State* v. *Oquendo*, 223 Conn. 635, 652–53, 613 A.2d 1300 (1992). Accordingly, we will analyze the issue of when the defendant was seized under the stricter state standard.[10] "[A] person [is defined] as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining whether a seizure has occurred, so as to invoke the protections of our state constitution . . . a court is to consider whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . . Whether there has been such a seizure in an individual case is a question of fact." (Citations omitted; internal

question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. . . . The initial determination is, therefore, whether the challenged evidence is in some sense the product of illegal government activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Spencer*, 268 Conn. 575, 599–600, 848 A.2d 1183, cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004).

[10] In contrast, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement . . . through means intentionally applied . . . . Thus, an unintended person . . . [may be] the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act. . . . A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise there is at most an attempted seizure, so far as the Fourth Amendment is concerned." (Citations omitted; internal quotation marks omitted.) *Brendlin* v. *California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007).

quotation marks omitted.) Id., 647; see also *State* v. *Santos*, 267 Conn. 495, 503–504, 838 A.2d 981 (2004); *State* v. *Hill*, 237 Conn. 81, 87–88, 675 A.2d 866 (1996); *State* v. *Ward*, 83 Conn. App. 377, 381–82, 849 A.2d 860, cert. denied, 271 Conn. 902, 859 A.2d 566 (2004).

In resolving the threshold question of if and when a seizure occurred, we are mindful that our analysis inherently is dependent on the court's underlying factual determinations, which the defendant materially does not challenge on appeal. As this court has observed, "[w]e do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop." (Internal quotation marks omitted.) *State* v. *Van Der Werff*, 8 Conn. App. 330, 337, 513 A.2d 154, cert. denied, 201 Conn. 808, 515 A.2d 380 (1986).

On duty police officers interact with individuals for a variety of reasons, many of which have nothing to do with "the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (Internal quotation marks omitted.) *State* v. *Foote*, 85 Conn. App. 356, 361, 857 A.2d 406 (2004) (discussing community caretaking capacity of local police officers), cert. denied, 273 Conn. 937, 875 A.2d 43, 44 (2005). It hardly can be suggested that every encounter between a police officer and an individual, regardless of whether such police officer is investigating criminal activity, constitutes a seizure. For example, a purely consensual encounter between a police officer and an individual in a public place is not necessarily a seizure. What begins as a consensual encounter, however, can escalate into a seizure. "Under our state constitution what starts out as a consensual encounter becomes a seizure if, on the basis of a show of authority by the police officer, a reasonable person in the defendant's position would have believed that he was not free to leave."

*State* v. *Oquendo*, supra, 223 Conn. 653, see also *State* v. *Williams*, 227 Conn. 101, 115, 629 A.2d 402 (1993).[11]

The relevant inquiry, therefore, focuses on the degree of authority exhibited by the police officer during his interaction with an individual. Courts have identified several factors to consider in this regard. For example, a police officer may exhibit authority by restricting a defendant's freedom of movement or by isolating him in some manner. See *State* v. *Greenfield*, 228 Conn. 62, 71–72, 634 A.2d 879 (1993). A police officer may also exhibit authority by use of his marked police cruiser, parking his cruiser in close proximity to a defendant's vehicle, displaying weapons and approaching a defendant at a late hour in an isolated location area. *State* v. *Oquendo*, supra, 223 Conn. 653. Certainly, in evaluating whether a reasonable person would feel free to terminate an encounter with a police officer and, thus, whether a seizure has occurred, we look to the words spoken by the police officer, especially those concerning the defendant's freedom to terminate the encounter. See *State* v. *Britton*, 283 Conn. 598, 609, 929 A.2d 312 (2007). As the foregoing authorities suggest, with regard to a police officer's show of authority, even a brief encounter between a police officer and an individual may consist of distinct stages, each of varying degrees of relevance.

In the present case, the court did not make any findings concerning when the defendant was seized but concluded that, at the time the defendant was seized, an investigative stop was lawful. The court accepted as true Grissette's uncontroverted testimony, which is set forth previously. On the basis of the court's findings,

---

[11] Grissette opined that, once he had asked the defendant to provide his name and date of birth, the defendant was not free to leave the scene. While we note Grissette's opinion because the defendant relies on it in support of his claims, it is of no consequence because it is the defendant's reasonable belief, and not the police officer's, that is pivotal to our analysis.

we conclude that the defendant was not seized until Grissette began to pursue him following his flight from the parked automobile. We base our conclusion on several factors. When Grissette arrived on the scene, he parked his marked police cruiser in the street in front of the residence. He did not park in the parking area near the defendant, and there is no evidence that he parked his vehicle such that he blocked the path of travel of the automobile in which the defendant was a passenger. Grissette did not interrupt the defendant's travel because the automobile already was stopped and parked when Grissette encountered it. There is no evidence that Grissette drove past the defendant before parking his cruiser or had used any device, such as flashing lights, a siren or a loud speaker, to draw attention to himself.

Grissette, dressed in his police uniform, approached the driver's side of the automobile only, asked the driver to open his window and asked the occupants: "Do either one of you live here?" There is no evidence that Grissette approached the automobile in an outwardly aggressive or rushed manner, that he brandished any type of weapon or that he spoke to the occupants using a loud tone of voice. Grissette was the only officer to interact with the defendant at the scene prior to the defendant's flight; officers had not surrounded the automobile.[12] The driver and the defendant answered Grissette's questions while they were seated in the automobile; there is no evidence that they asked to terminate the encounter. Also, there is no evidence that

---

[12] Although Grissette testified that another officer arrived on the scene just prior to the defendant's flight, there are absolutely no findings by the court or other evidence concerning that officer's conduct or presence at the scene. Absent any findings that this second police officer had any interaction with the defendant prior to his flight from the parked automobile, or that the defendant was aware or in a position to be aware of his presence at the scene prior to that time, we do not afford significance to his mere arrival on the scene prior to Grissette's pursuit of the defendant.

Grissette instructed either occupant to exit the vehicle, to raise his hands, to remain on the scene or to accompany him anywhere. Grissette asked questions without instructing the defendant or the driver that they were obligated to respond, that they were not free to leave or that they were suspected of having committed any crime. Further, Grissette did not seize any personal property of the driver or the defendant.

We are mindful that Grissette's mere appearance in a police uniform, at a late hour, at the driver's door, might be said to have conveyed some degree of authority. Yet, when we examine the totality of the circumstances, including Grissette's words and actions, we do not conclude that, before the defendant ran from the automobile, he conveyed such a degree of authority that a reasonable person in the defendant's position could have believed that he was not free to terminate the encounter and leave the scene. Thus, we disagree with the defendant that he had been seized when Grissette approached the automobile or merely began conversing with the driver and the defendant.

In reaching our conclusion, we distinguish the present case from *State* v. *Oquendo*, supra, 223 Conn. 635, on which the defendant relies. On appeal, the defendant in *Oquendo* claimed that the trial court improperly had denied his motion to suppress physical and identification evidence that he argued was the fruit of an illegal seizure. Id., 640. Our Supreme Court set forth the relevant facts underlying the claim: "On August 29, 1988, at approximately 12:50 a.m., [Wallingford police officer William Birney, a patrolman with approximately two and one-half years of experience at the time relevant to the appeal] was patrolling in the area of East Main Street and Center Street in Wallingford in a marked police cruiser. Birney was wearing a uniform and a badge and was armed with a nightstick and a firearm. Birney described the area as primarily residential, with

a shopping plaza that contains several small businesses. At the time of the patrol, all of the businesses were closed. Birney was aware that there had recently been a series of burglaries on East Main Street.

"As Birney drove east on East Center Street, he saw a man and a woman walking toward him. He recognized the woman as Nanette Williams, whom he recognized as having recently been arrested on larceny and burglary charges. Although it was 'very warm' out, Williams was wearing a 'thick jacket.' Her male companion, later identified as the defendant, was wearing a zipped 'winter' jacket and carrying a tan, 'gym type' duffel bag. As Birney drove past Williams and the defendant, they 'kind of looked at each other' and appeared to quicken their pace. Birney was familiar with Wallingford's 'street people' and had never seen the defendant. Birney thought that it was 'strange' that the defendant was wearing a winter jacket when it was 'so warm out.' It was not raining at the time. Birney knew from experience that burglars often wear heavy clothing to protect themselves from injury when they break windows. He had a 'hunch' that Williams and the defendant had recently committed or were about to commit a burglary.

"Birney turned the cruiser around and drove back in the direction of Williams and the defendant. He stopped about seven yards away from them, exited the cruiser and stood by the driver's side door. Birney asked Williams what she and the defendant were doing. She replied that they were coming from the Junction Cafe. Birney knew that they were, in fact, walking in the direction of the Junction Cafe and that the cafe had closed at 11 p.m., nearly two hours earlier. Birney then asked the defendant to identify himself and the defendant answered, 'Freddy Velez.' Both Williams and the defendant appeared nervous and kept glancing at each other. Birney asked the defendant to approach the

cruiser. The defendant handed the duffel bag to Williams and stepped toward Birney. Birney instructed the defendant to bring the bag with him. The defendant then 'grabbed the bag away from [Williams], gave a quick look up and down and ran away.' Birney yelled to the defendant to 'stop' and pursued him on foot through a yard and into a wooded area. Birney saw the defendant throw down the duffel bag as he entered the wooded area. Birney retrieved the bag, which was open. Inside the duffel bag he saw two plastic bags containing white powder, which subsequently tested positive for cocaine." Id., 640–42.

In its denial of the defendant's motion to suppress the duffel bag and Birney's identification of the defendant, the trial court in *Oquendo* determined that an investigative stop of the defendant had occurred "at some point after Birney exited his cruiser and began to question the defendant and Williams"; id., 642; and that Birney's seizure of the defendant was lawfully supported by "a reasonable and articulable suspicion to believe that the defendant had been, or was about to be, engaged in criminal activity . . . ." Id., 643.

Our Supreme Court, applying article first, §§ 7 and 9, of the Connecticut constitution, resolved the issue of when a seizure of the defendant had occurred as follows: "Birney was on patrol in a marked police cruiser. He drove past the defendant and Williams, turned around and stopped approximately twenty feet from them. Birney then stepped out of the cruiser and stood next to the driver's door as the defendant and Williams walked toward him. Birney was dressed in full police uniform and visibly armed with a gun and a nightstick. After Birney asked Williams where she and the defendant were going, he asked the defendant his name. The defendant gave him the name 'Freddy Velez.' Birney told the defendant to approach the cruiser. The defendant gave the bag to Williams and stepped toward

Birney. Birney told the defendant to bring the bag with him.

"The state characterizes this entire interaction as a consensual encounter. Under our state constitution what starts out as a consensual encounter becomes a seizure if, on the basis of a show of authority by the police officer, a reasonable person in the defendant's position would have believed that he was not free to leave. . . . In view of all the circumstances, including the lateness of the hour, the fact that Birney was armed and the fact that there was no one other than the defendant and Williams in the vicinity, we are persuaded that a reasonable person in the defendant's position would not have believed that he was free to ignore Birney's instructions and walk away." (Citation omitted.) Id., 652–53. The court thereafter concluded that the trial court's determination that the seizure was based on a reasonable and articulable basis of suspicion was clearly erroneous and that the court should have excluded the evidence that was tainted by the illegal seizure. Id., 657.

At issue in *Oquendo*, as in the present case, was the nature of the encounter between the defendant and the police officer prior to the officer's foot pursuit. In this regard, there are some relevant factual similarities between *Oquendo* and the present case. In both cases, the encounter prior to pursuit occurred late at night, although it occurred nearly three hours later in the evening in *Oquendo*. Id., 641. In both cases, there was no one other than the defendant and an acquaintance in the vicinity when the encounter occurred. Both encounters involved an officer in uniform who initially arrived on the scene in a marked police cruiser. Id. The factual differences between the cases, however, are significant and material. In *Oquendo*, the officer displayed his authority by driving past the defendant before turning around and stopping his cruiser a short

distance away from him. Id. The officer, visibly armed with a gun and a nightstick, did not merely ask the defendant questions concerning his identity and activities. Instead, the officer exited his cruiser on a public roadway, asked the defendant and Williams questions and attempted to restrict the defendant's freedom of movement by telling him to approach him with his duffel bag. Id., 642. These factors, which are directly related to the display of authority by the police prior to pursuit, distinguish *Oquendo* from the present case.

The nature of the encounter between Grissette and the defendant, however, changed when, as the court found, the defendant "burst" out of the automobile after another police officer arrived on the scene. At that point, Grissette chased the defendant until he stopped at a fence, grabbed the defendant and handcuffed him. Grissette's conduct in pursuing and, shortly thereafter, restraining the defendant unquestionably constituted a strong display of police authority. Such pursuit and physical restraint clearly conveyed that the encounter was no longer consensual. At this point, no reasonable person in the defendant's position would have believed that he was free to terminate the encounter and to leave the scene. Thus, at the time of the pursuit, a seizure of the defendant had occurred.

B

Having determined the time at which a seizure of the defendant took place, we must next determine whether the court properly concluded that the seizure was constitutionally permissible.

At the suppression hearing, the state justified the warrantless seizure of the defendant on the basis of a lawful investigative detention. The state argued that the seizure was supported by a reasonable and articulable suspicion. Conversely, the defendant argued that his

seizure was not supported by a reasonable and articulable suspicion. The court determined that, under the circumstances, an "investigative stop" was lawful. The parties dispute the correctness of the court's determination that a lawful investigative detention occurred at the time of the defendant's seizure; the defendant claims that an investigatory detention, albeit an illegal one, occurred at the moment he was seized. This court must "decide [the] case on the theory on which it was tried and decided in the trial court, and briefed and argued in this court." *State* v. *Martin*, 2 Conn. App. 605, 612B, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985); see also *State* v. *Groomes*, 232 Conn. 455, 468 n.13, 656 A.2d 646 (1995) (court examines legality of seizure on basis of theory of seizure analyzed by defendant). That theory is that the seizure, to be lawful, must have been based on a reasonable and articulable suspicion.[13]

The law regarding investigative detentions is well settled in federal and state jurisprudence. "Article first, §§ 7 and 9 of our state constitution permit a police officer in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes even though there is no probable cause to make an arrest. . . . In determining whether the detention was justified in a given case, a court must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational

[13] Thus, although Grissette testified that he arrested the defendant shortly after apprehending him, we are not asked to determine whether the defendant's seizure constituted an arrest supported by probable cause.

inferences to be derived therefrom. . . . These standards, which mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio*, [392 U.S. 1, 20–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9 of our state constitution." (Citations omitted; internal quotation marks omitted.) *State* v. *Donahue*, 251 Conn. 636, 643–44, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000).

"Police have the right to stop for investigation short of arrest where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . . [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) Id., 645.

"When considering the validity of a *Terry* stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Santos*, supra, 267 Conn. 503.

Prior to the time of the seizure, Grissette became aware of several facts. Upon arriving at the scene, he observed a black automobile with New York marker plates occupied by two black males. The automobile and its occupants fit the description provided by Grissette's dispatcher, and the automobile was present at

the exact location provided to him. There was no evidence that Grissette, or the police generally, had any prior relationship with the source of this information provided to the police. To the extent that the tipster who provided this information to the police predicted that drug activity was occurring at that location, Grissette did not observe any such activity.

Having corroborated innocuous yet detailed facts that were provided to the police, Grissette approached the automobile. The driver and the defendant replied that they did not live at that private location and did not volunteer any lawful purpose for their presence there at 10 p.m. The driver hesitantly provided factually inaccurate responses to Grissette's basic inquiries concerning his name and date of birth. Shortly thereafter, the defendant hastily exited the automobile and began to run away from it.

The foregoing circumstances, viewed in their totality, yielded sufficient specific and articulable facts to render Grissette's seizure of the defendant constitutionally reasonable. We must presume that Grissette applied his police experience and common sense in analyzing these circumstances. The defendant's unexplained presence at the scene, the driver's inaccurate responses as well as the defendant's conduct in running from the automobile are factors that would lead a reasonable observer to believe that the defendant was acting in a suspicious manner and that criminal conduct was afoot. Our conclusion does not rest on any single factor but all of these factors in their totality. Certainly, the defendant's flight, absent any provocation by the police, was significant. "Flight from the police properly can be considered in determining whether a reasonable and articulable basis of suspicion exists where the defendant flees before the police attempt to stop him. See *Illinois* v. *Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000); *State* v. *Groomes*, supra, 232 Conn.

471–72; *State* v. *Rodriguez*, 14 Conn. App. 574, 578, 542 A.2d 342 (1988)." *State* v. *Wright*, 58 Conn. App. 136, 145–46, 752 A.2d 1147, cert. denied, 254 Conn. 907, 755 A.2d 884 (2000); see also *State* v. *Oquendo*, supra, 223 Conn. 656 (noting "police conduct that *provokes* flight precludes the consideration of this factor" [emphasis in original]). Also, this is not a case, as the defendant suggests, in which a seizure was based solely on uncorroborated information provided by an anonymous tipster. As discussed previously, the information provided by the tipster led to a consensual encounter; the conduct observed during that encounter reasonably constituted a particularized and objective basis to suspect that the defendant was engaged in criminal activity. Further, although the defendant does not argue that an unreasonable degree of restraint was inflicted on him during this detention, we conclude that such restraint was not unreasonable in light of his flight from Grissette.[14]

We conclude that the defendant's seizure was supported by a reasonable and articulable suspicion that he was engaged in criminal conduct. The defendant has failed to demonstrate that his seizure was unlawful and, thus, cannot demonstrate that the gun was in any sense the fruit of police illegality related to that seizure.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[14] The state argued before the trial court, and has argued before this court, that the defendant's conduct supported a reasonable and articulable suspicion that the defendant had committed the crime of trespassing. The trial court also deemed it material that the defendant had been charged with criminal trespassing following his seizure.