******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, J., with whom ROGERS, C. J., and PALMER, EVELEIGH and McDONALD, Js., join, concurring. I agree with the majority that the defendant, Michael Edmonds, was seized by the police when an officer commanded him to stop, and that this seizure was not supported by reasonable suspicion. I write separately to address the following concerns raised in the dissent: (1) that the majority's opinion "will ultimately have the practical effects of hindering law enforcement at the most fundamental level"; (2) that citizens living in "crime-plagued neighborhoods will likely meet today's decision with bewilderment and frustration"; and (3) that such individuals "will ultimately be less safe" as these areas "will become fertile soil for the growth of further crime" as a result of the majority's opinion. On the contrary, I believe that the majority strikes an appropriate balance between law enforcement interests in investigating crimes and keeping their communities safe, and citizens' interests in enjoying their rights under the fourth amendment to the United States constitution, regardless of the fact that they may live or work in "crime-plagued neighborhoods . . . ." I address each of these troubling issues in turn.[1]

I first disagree with the dissent's assertion that "police will be hamstrung in their ability to thoroughly investigate and prevent crime" as a result of the majority's opinion. Contrary to the dissent's assertions, the majority does not imply that a *per se* seizure occurs when the officers merely "[pull] into a parking lot" and "sa[y] something indeterminate" to a suspect. The majority instead concludes that a variety of additional facts, which reveal the true character of the encounter, demonstrate that the defendant *in this case* reasonably did not feel free to leave. These facts include: (1) two marked police cruisers converged on him nearly simultaneously in a parking lot from opposite directions; (2) the cruisers at least partially blocked his ability to leave the area on foot; (3) the defendant was the only person in the parking lot; (4) the encounter occurred at night; (5) the cruisers' headlights were focused on only him; (6) the parking lot is private property; (7) when the defendant initially *tried* to exercise his right to leave, by turning in the opposite direction when the first marked cruiser pulled up in front of him, a second marked cruiser blocked his path in that direction; (8) three uniformed and armed police officers exited from the cruisers; and (9) one of the officers commanded him to stop. As the dissent recognizes, "the question of whether a defendant has been seized must be reviewed under the totality of the circumstances." See *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *State* v. *Burroughs*, 288 Conn. 836, 845, 955 A.2d 43 (2008). As such, nothing about

the majority's opinion prevents officers from approaching and questioning citizens under more routine circumstances. See, e.g., *State* v. *Kimble*, 106 Conn. App. 572, 594–95, 942 A.2d 527 (occupants of parked vehicle not seized when, at night, uniformed police officer exited marked cruiser, approached vehicle, and questioned them), cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008); see also *Florida* v. *Royer*, 460 U.S. 491, 497–98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) ("officers do not violate the [f]ourth [a]mendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions [or] by putting questions to him if the person is willing to listen"). Moreover, the officers' conduct in this case emphatically does not suggest an attempt to engage in the type of "cooperative discourse" that the dissent worries will be "snuffed out" by the majority opinion.

Second, I do not agree with the dissent's assertion that citizens living in "crime-plagued neighborhoods" will "meet today's decision with bewilderment and frustration." The majority concludes that police seized the defendant when they converged on him in two marked cruisers from opposite directions and commanded him to stop, and that this seizure was not supported by reasonable suspicion, because he was merely standing in a parking lot, at night, in a high crime area. I fail to see how such a decision would create "bewilderment and frustration" among people living in high crime areas, many of whom have been subject to a disproportionate number of suspicionless stops. See A. Wolf, "The Adversity of Race and Place: Fourth Amendment Jurisprudence in *Illinois* v. *Wardlow*, [120] S. Ct. 673 (2000)," 5 Mich. J. Race & L. 711 (1999–2000) ("it is not surprising that 'high-crime area' residents are disproportionately the victims of police harassment"). As Justice Sotomayor of the United States Supreme Court has recognized, "many innocent people are subjected to the humiliations of . . . unconstitutional [stops and] searches." *Utah* v. *Strieff*, U.S. , 136 S. Ct. 2056, 2070, 195 L. Ed. 2d 400 (2016) (Sotomayor, J., dissenting). The prevalence of suspicionless stops have "created an expectation among residents . . . that they will be stopped, interrogated, and frisked numerous times in the course of a month, or even a single week." (Internal quotation marks omitted.) K. Koss, "Leveraging Predictive Policing Algorithms to Restore Fourth Amendment Protections in High-Crime Areas in a Post-Wardlow World," 90 Chi.-Kent L. Rev. 301, 323 (2015).

I believe that the majority's opinion takes an important step forward in protecting the fourth amendment rights of citizens living in such areas. By holding that police may not approach a pedestrian in the intimidating manner displayed in the present case solely on the basis of his or her presence in a high crime area, the

majority ensures that this court does not "significantly [lower] constitutional protections for law-abiding citizens who, by choice or for reasons beyond their control, live in high-crime areas . . . ." *United States* v. *Black*, 525 F.3d 359, 366 (4th Cir.) (Gregory, J., dissenting), cert. denied, 555 U.S. 875, 129 S. Ct. 182, 172 L. Ed. 2d 129 (2008). To allow such conduct by police in the absence of a reasonable suspicion of criminal activity would, in my view, render citizens living in these areas "less than other citizens for purposes of constitutional protection based on their economic and social standing," a position that has "no place in a constitutional democracy." *State* v. *Ward*, 80 Ohio App. 3d 701, 706, 610 N.E.2d 579 (1992) (Harper, J., dissenting).

In the present case, other than observing that the defendant was a black man standing in the parking lot of a restaurant, the officers did not point to *any* suspicious conduct on the part of the defendant in justifying their initial seizure of him, beyond his presence in a high crime area.[2] The United States Supreme Court has unequivocally stated, however, that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). To hold otherwise would, as one trial court judge from Ohio put it, render the fourth amendment "meaningless" in high crime areas. *State* v. *Dancer*, 52 Ohio Misc. 2d 9, 11, 557 N.E.2d 178 (1989). The judge in that case granted the defendant's motion to suppress after police ordered her to provide identification and empty her purse simply because she was sitting at a bar that had been the site of previous drug activity. Id. In granting that motion, the judge posed the following question: "Do persons living, by choice or more likely by duress of circumstances, in a 'high crime' area give up their constitutional rights, while those persons living in fancy suburbs or drinking at the country club bar are protected?" Id. I would answer this question, *no*. As Judge Roger Gregory of the United States Court of Appeals for the Fourth Circuit put it: "It has never been my understanding of the [f]ourth [a]mendment that those with less means likewise receive less constitutional protection as a result of their plight. It is written into the very fiber of our [c]onstitution that the protections granted therein apply equally to all Americans, regardless of whether they are returning home to the grandest of mansions or the humblest of shanties." *United States* v. *Black*, supra, 525 F.3d 370 (Gregory, J., dissenting). I, therefore, posit that citizens living in "crime-plagued neighborhoods" in Connecticut should not, and will not, meet today's opinion with "bewilderment and frustration" as suggested by the dissent.

Lastly, I respectfully, but emphatically, disagree with the dissent's contention that citizens living in high crime

areas "will ultimately be less safe," and that those areas "will become fertile soil for the growth of further crime" as a result of the majority's opinion. Suspicionless stops are not only a violation of an individual's constitutional rights, they often breed fear and distrust toward police, which, in my view, is an additional unacceptable burden to place on the shoulders of citizens living in high crime areas. See, e.g., *Illinois* v. *Wardlow*, supra, 528 U.S. 134 n.10 (Stevens, J., concurring in part and dissenting in part) (citing report concluding that New Jersey police engaged in "disparate treatment," which "engender[ed] feelings of fear, resentment, hostility, and mistrust" [internal quotation marks omitted]). As Justice Stevens of the United States Supreme Court has emphasized, some citizens, "particularly minorities and those residing in high crime areas," flee from police even when they are entirely innocent, believing that any contact with the police can be dangerous. Id., 132. He further noted that these fears "are validated by law enforcement investigations into their own practices" and that the evidence supporting the reasonableness of these fears "is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient." Id., 133–34. Intuitively, when citizens avoid and actively refuse to interact with police out of fear of becoming a suspect, the opportunities for positive dialogue between the police and citizens disappear. This means that the police will also miss out on learning important information related to actual criminal activity in those communities.

Beyond fear and distrust, some citizens have developed hostility and animosity toward police as a result of the prevalence of suspicionless stops. See *Johnson* v. *State*, 70 Ark. App. 343, 370, 19 S.W.3d 66 (2000) (Griffen, J., dissenting) (noting "ever-present hostility and simmering rage of many persons from poor and minority communities about unjust police conduct"), aff'd, 343 Ark. 343, 37 S.W.3d 191 (2001); K. Koss, supra, 90 Chi.-Kent L. Rev. 304 ("[c]ourts' deference to police officers' subjective experiences has created significant animosity between the residents of these neighborhoods and law enforcement"). Such hostility may stem from the dehumanizing nature of some of these encounters. Justice Sotomayor describes such a stop: "Although many Americans have been stopped for speeding or jaywalking, few may realize how degrading a stop can be when the officer is looking for more. . . . The indignity of the stop is not limited to an officer telling you that you look like a criminal. . . . The officer may next ask for your consent to inspect your bag or purse without telling you that you can decline. . . . Regardless of your answer, he may order you to stand helpless, perhaps facing a wall with [your] hands raised. . . . If the officer thinks you might be dangerous, he may then frisk you for weapons. This involves more than just a pat down. As onlookers pass by, the officer

may feel with sensitive fingers every portion of [your] body. A thorough search [may] be made of [your] arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet." (Citations omitted; internal quotation marks omitted.) *Utah* v. *Strieff*, supra, 136 S. Ct. 2069–2070 (Sotomayor, J., dissenting). As such, the United States Supreme Court has acknowledged that "[i]n many communities, field interrogations are a major source of friction between the police and minority groups." (Internal quotation marks omitted.) *Terry* v. *Ohio*, 392 U.S. 1, 14 n.11, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). When police routinely "stop and question persons on the street who are unknown to them, who are suspicious, or whose purpose for being abroad is not readily evident," according to the court, such interactions "cannot help but be a severely exacerbating factor in police-community tensions." (Internal quotation marks omitted.) Id., 14–15 n.11. By sowing fear and distrust of police, such tensions could ultimately make high crime areas even less safe for the people who live there. As one scholar stated, "[u]ndemocratic policing . . . increases the perception of illegitimacy, which in turn can increase levels of crime and reduce police-citizen cooperation." I. Capers, "Rethinking the Fourth Amendment: Race, Citizenship, and the Equality Principle," 46 Harv. C.R.-C.L. L. Rev. 1, 34 (2011). Instead "individuals are more likely to voluntarily comply with the law when they perceive the law to be legitimate and applied in a nondiscriminatory fashion." Id., 47.

Moreover, widespread stops in high crime areas may not even be a "particularly efficient or even accurate method of identifying wrongdoers." R. Hutchins, "Stop Terry: Reasonable Suspicion, Race, and a Proposal to Limit Terry Stops," 16 N.Y.U. J. Legis. & Pub. Policy 883, 902–903 (2013). For example, one study found that, of the 4.4 million people stopped in New York City between 2004 and 2012, almost 90 percent were released by the police after no evidence of wrongdoing was found. Id. I, therefore, disagree with the dissent's contention that citizens living in high crime areas "will ultimately be less safe" as a result of the majority's opinion, especially because the majority's opinion will *not* hinder law enforcement efforts to approach and question suspects.

Accordingly, I join in the judgment of the court.

[1] The broader social policy issues raised by the dissent were not briefed, argued, or even broached by the parties or the majority. While I earnestly believe that this is not the proper place or time to discuss the extremely complex societal issues of police enforcement in "crime-plagued neighborhoods," if I did not do so, the ominous assertions made in the dissent would go unquestioned. This is something that I simply cannot accept, especially when the satisfactory resolution of these issues requires both critical analysis and open, honest and robust debate, given these very troubling times in our nation's history. This separate and relatively short concurrence should by no means be regarded as a substitute for the comprehensive in-depth discussion that I believe is necessary.

[2] As the majority states, although the nearby restaurant had been the site of previous robberies, that "particular location had not reported any criminal activity for at least the prior four months, and no incidents had been reported in the area that evening." Although one of the officers testified that the defendant was "loitering" in "the shadows," the majority aptly notes that, because it was nighttime, "the only reasonable inference is that *anyone* standing outside the [restaurant] at dinnertime on that particular evening necessarily would have been standing in the 'shadows.' " (Emphasis in original.) Finally, as the majority also notes, the officer also "had no reason to believe that [the defendant] was in violation of [the applicable municipal] loitering ordinance," especially since it may reasonably be assumed that the restaurant was open for dinner at that time.