******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JOSEPH FIELDS
## (AC 43115)

Bright, C. J., and Alexander and Norcott, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of operating a motor vehicle while under the influence of intoxicating liquor or drugs and operating a motor vehicle while having an elevated blood alcohol content, the defendant appealed to this court, claiming that the trial court improperly declined to suppress evidence of his performance of a field sobriety test, a search warrant application and his blood alcohol content because that evidence was the tainted fruit of an illegal detention of him by the police. Following a report of a one vehicle accident on Interstate 84, O, a state trooper, was dispatched to the scene. While en route, O was informed by the dispatcher, who was watching the site through live feed cameras, that the two occupants of the vehicle were running from the scene. When O arrived at the scene, she observed the defendant and another person walking along the highway approximately 300 feet from the crashed vehicle. O approached them and briefly placed them in handcuffs for her safety and to prevent them from fleeing further. When another trooper arrived, O removed the handcuffs and began to administer field sobriety tests to the defendant, who was the driver of the vehicle. While O was speaking with him, she detected the odor of alcohol coming from his breath and noticed that his speech was slow and slurred and that his eyes were "glossy." The defendant failed the first test and declined to perform another. Thereafter, the defendant was transported to a hospital. O remained at the scene where she obtained an account of the accident by the person who had reported it. He told O that he had observed the defendant's vehicle travelling at a high rate of speed, slide out of control and crash and that, when he spoke with the defendant, he could smell alcohol on his breath. O also inspected the defendant's vehicle and found an empty beer bottle and an empty bottle of liqueur. Subsequently, O prepared an application for a search and seizure warrant with a supporting affidavit to obtain the toxicology test results from blood and urine samples taken from the defendant while he was in the emergency department of the hospital. The trial court issued the warrant, and O obtained the toxicology test results, which showed that the defendant's blood alcohol content was two and one-half times the statutory limit. Prior to trial, the defendant filed a motion to suppress any evidence that had been unlawfully obtained by the police. The trial court granted the motion as to any evidence obtained by the police while the defendant was handcuffed and denied it as to any evidence obtained after the handcuffs were removed, including evidence of the failed field sobriety test and the defendant's blood alcohol content. *Held* that, contrary to the defendant's contention that evidence of the field sobriety test, the search warrant application and his blood alcohol content were the tainted fruit of an illegal detention, O's detention of the defendant was constitutionally permissible, as the totality of the circumstances gave rise to a reasonable and articulable suspicion that a crime had been committed, and, therefore, O was permitted to detain the defendant to maintain the status quo for a brief period to enable her to investigate; moreover, even if this court assumed that the field sobriety test was the fruit of an illegal detention and should have been suppressed, evidence of the defendant's blood alcohol content was not subject to suppression, as it was admissible under the independent source doctrine because the search warrant contained ample independent evidence supporting a finding of probable cause and, in light of that untainted evidence, it was inconceivable that O would not have sought a search warrant for the defendant's blood test results, irrespective of the additional information purportedly gained from the allegedly tainted field sobriety test.

Argued May 17—officially released September 28, 2021

*Procedural History*

Substitute information charging the defendant with the crimes of operating a motor vehicle while under the influence of intoxicating liquor or drugs, operating a motor vehicle while having an elevated blood alcohol content and evasion of responsibility in the operation of a motor vehicle, brought to the Superior Court in the judicial district of New Haven, geographical area number seven, where the court, *Grossman, J.*, denied in part the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *Grossman, J.*; verdict and judgment of guilty of operating a motor vehicle while under the influence of intoxicating liquor or drugs and operating a motor vehicle while having an elevated blood alcohol content, from which the defendant appealed to this court. *Affirmed.*

*Kirstin B. Coffin*, assigned counsel, with whom, on the brief, was *David J. Reich*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *James Dinnan*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Joseph Fields, appeals from the judgment of conviction, rendered after a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor or drugs and operating a motor vehicle while having an elevated blood alcohol content in violation of General Statutes § 14-227a (a) (1) and (2), respectively. The defendant claims that the trial court improperly declined to suppress evidence of his performance of a field sobriety test and evidence of his blood alcohol content, the latter of which was obtained pursuant to a search warrant application,[1] because that evidence was the tainted fruit of his unlawful detention by the police. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our discussion. On August 2, 2017, at approximately 11:30 p.m., Glenn L. Bossie was operating his company's dump truck on Interstate 84. As he was driving down the right-hand lane, Bossie observed through the truck's mirrors a car approaching from behind at a high rate of speed. He then watched the car pull behind him, immediately pass his truck sideways, strike the center barrier, cross back over the highway, and then come to rest in a grassy area off of the highway. Bossie stopped his truck and approached the damaged, heavily smoking car to determine if its passengers were hurt. He observed a female, later identified as Kori Charette, walking up the embankment to the Route 691 interchange. Bossie contacted the police to report the accident.

Bossie then approached the defendant, who was in the driver's seat of the car. Bossie noticed that the defendant strongly smelled of alcohol. As Bossie spoke with the defendant, Charette began yelling, "hey, hey . . . we got to get outta of here, we got to get outta of here." The defendant, after assuring Bossie that he was unharmed, followed Charette up the embankment and started hitchhiking on the ramp to Route 691. Bossie relayed this information to the 911 dispatcher. A truck stopped, and the defendant and Charette began running to get to the vehicle. The police, however, arrived at the scene as they were running to the truck, and the truck left the scene.

Trooper Fawn Ouellette was dispatched to the scene of the accident. As she was traveling to the scene, the dispatcher was watching the site through live feed cameras of the Department of Transportation (department). The dispatcher informed Trooper Ouellette that there was "a one car accident into the guardrail and that there were . . . two occupants running from the scene." When Trooper Ouellette arrived at the scene, she observed the defendant and Charette walking down

the right shoulder of the highway approximately 300 feet from where the vehicle involved in the crash was stopped. She approached them and briefly placed them in handcuffs for her safety and to prevent them from fleeing further. Another trooper arrived shortly thereafter to assist her.

Trooper Ouellette removed the handcuffs from the defendant and Charette, and she began administering field sobriety tests to the defendant. While speaking with the defendant, Trooper Ouellette noticed that his eyes were "glossy" and that his speech was slow and slurred. She also detected the odor of an alcoholic beverage coming from his breath. Trooper Ouellette administered the horizontal gaze nystagmus test[2] to the defendant, and he failed all three portions of the test. Trooper Ouellette then asked the defendant to perform another field sobriety test, the walk and turn test, but the defendant declined, citing neck pain. Thereafter, the defendant was transported to Saint Mary's Hospital in Waterbury. Trooper Ouellette remained at the scene, where she obtained Bossie's account of the accident. She also examined the defendant's car and found inside an empty bottle of beer, an empty bottle of Jägermeister liqueur, and two unopened bottles of vodka.

While the defendant was in the emergency department of the hospital, hospital personnel took blood and urine samples from him. Trooper Ouellette sought to obtain the toxicology test results from these samples through a search and seizure warrant. Trooper Ouellette prepared an affidavit as part of an application for a search and seizure warrant and attested that (1) she was dispatched to a motor vehicle accident and was advised en route that the two occupants in the vehicle were running from the scene, (2) when she arrived at the scene, she saw the defendant and Charette walking down the right shoulder of the highway approximately 300 feet from the vehicle, (3) upon speaking with the defendant, she immediately detected the odor of alcohol coming from his breath and noticed that his speech was slow and slurred and his eyes were glossy, (4) after the defendant was transported to the hospital, she inspected the vehicle and observed an empty bottle of beer, an empty bottle of Jägermeister, and two full bottles of vodka, and (5) a witness told Trooper Ouellette at the scene that he had observed the defendant's vehicle traveling at a high rate of speed, slide out of control, and crash and that, when he spoke to the defendant, he could smell alcohol on his breath. Thereafter, the court issued the warrant, and Trooper Ouellette obtained the toxicology test results. The toxicology report showed that the defendant had a blood alcohol content of 0.20 percent, two and one-half times the statutory limit of 0.08 percent. See General Statutes § 14-227a (a) (2).

The defendant was charged by way of a long form

information with operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14-227a (a) (1), operating a motor vehicle with an elevated blood alcohol content in violation of § 14-227a (a) (2), and evasion of responsibility in the operation of a motor vehicle in violation of General Statutes § 14-224 (b) (3).[3]

On February 5, 2019, the defendant filed a motion to suppress any evidence that had been unlawfully obtained by the police. The defendant's motion to suppress was broad and sought suppression of "any and all evidence, whether tangible or intangible, and including statements and identifications . . . seized or obtained illegally, without a warrant or probable cause, or in violation of the Connecticut or United States constitution." The motion further stated that the defendant "is presently unable to be more specific and detailed in the present motion" and reserved the right to amend and particularize it after defense counsel completed her investigation of the case. A suppression hearing was held by the court, *Grossman, J.*, on April 25 and 26, 2019. During the hearing, Trooper Ouellette testified regarding her investigation of the accident and her detention of the defendant at the scene. Following the evidentiary portion of the hearing, the defendant moved to suppress all evidence obtained after he was detained by Trooper Ouellette, including the field sobriety test and his blood test results. The defendant argued that Trooper Ouellette's handcuffing of him constituted an illegal detention because she lacked a particular suspicion that he was engaged in any criminal wrongdoing. As a result, in the defendant's view, all of the evidence that followed this illegal detention was tainted fruit of the poisonous tree and was subject to suppression.[4] In response, the state conceded that Trooper Ouellette had detained the defendant. The state argued, however, that the detention was lawful because Trooper Ouellette had a reasonable and articulable suspicion that criminal activity was afoot. The state also contended that Trooper Ouellette's use of handcuffs was reasonable under the circumstances because she had received information that individuals were fleeing the scene of the accident and she was alone and dealing with two suspects at night.

The court granted in part and denied in part the defendant's motion to suppress. The court granted the motion with respect to evidence of any statements that the defendant had made while he was handcuffed on the ground that Trooper Ouellette was not justified in handcuffing the defendant because there was no indication that such force was necessary. The court denied the motion to suppress with respect to any evidence obtained after the handcuffs were removed, including evidence of the failed field sobriety test and the defendant's blood alcohol content. The court found that it was not unreasonable for Trooper Ouellette to suspect

that the accident might have been related to an incident of drunk driving and that she was justified in requesting that the defendant perform field sobriety tests. It further found that evidence of the defendant's blood alcohol content was not subject to suppression for the additional reason that it had been obtained through a valid search warrant that would have been granted regardless of any reference therein to the defendant's performance of field sobriety tests.

Trial began on April 30, 2019. On May 2, 2019, the jury found the defendant guilty of operating a motor vehicle while under the influence of intoxicating liquor or drugs and operating a motor vehicle with an elevated blood alcohol content. The jury found him not guilty of evasion of responsibility in the operation of a motor vehicle. On May 9, 2019, the court sentenced the defendant to a term of six months of incarceration, execution suspended after thirty days, and twenty-four months of probation. This appeal followed.

On appeal, the defendant argues that Trooper Ouellette illegally detained him because he was not committing any crime at the time that she handcuffed him. As a result, the defendant claims that the court erred by not suppressing evidence of his field sobriety test, the search warrant application, and his blood alcohol content because they were the fruits of an illegal detention. In response, the state agrees that the defendant was detained when Trooper Ouellette handcuffed him. The state contends, however, that the defendant's detention was not illegal because Trooper Ouellette possessed a reasonable and articulable suspicion that criminal activity, namely driving while intoxicated, had occurred. Additionally, the state argues that, even if evidence of the field sobriety test was fruit of an unlawful detention, the evidence of the defendant's blood alcohol content was untainted by any illegality because the search warrant application contained ample independent evidence supporting a finding of probable cause for the seizure of the defendant's blood test results. We agree with the state that the defendant's detention was not illegal and that evidence of his blood alcohol content was untainted.

We are guided by the following standard of review and relevant legal principles. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts [found by the trial court] . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 331 Conn. 239, 246, 203 A.3d 1233 (2019).

"Under the fourth amendment to the United States

constitution, and under article first, [§§ 7 and 9, of the] Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." (Internal quotation marks omitted.) Id., 247. "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . Whether a reasonable and articulable suspicion exists depends on the totality of the circumstances. . . .

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . .

"[E]ffective crime prevention and detection . . . [underlie] the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. . . . Therefore, [a]n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal. . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Barone*, 154 Conn. App. 543, 555–56, 107 A.3d 490, cert. denied, 315 Conn. 928, 112 A.3d 778 (2015).

We conclude that Trooper Ouellette's detention of the defendant was constitutionally permissible. As Trooper Ouellette was traveling to the scene of the accident, she received information from the dispatcher that there was a single car accident into a guardrail and that the two occupants of the car were fleeing from the scene. The dispatcher's information that the two occupants were running from the scene was based both on the

dispatcher's firsthand viewing of the scene through the department's live feed cameras and on Bossie's statements over the phone that the occupants were attempting to hitchhike. On arriving at the scene, Trooper Ouellette also observed the defendant and Charette walking down the right shoulder of the highway approximately 300 feet from where the vehicle involved in the crash was stopped. The totality of the circumstances, which included an unexplained single car accident late on a summer night and reports of the two occupants of the vehicle attempting to leave the scene, thus gave rise to a reasonable and articulable suspicion that a crime had been committed.[5] See *State* v. *Dotson*, 154 Conn. App. 621, 623–25, 108 A.3d 1143 (2015) (police had reasonable and articulable suspicion that criminal activity was afoot when defendant drove at higher than normal rate of speed, failed to heed flashlight beam shined on him by officer, and made K-turn during which his front tire mounted sidewalk); *State* v. *Jensen*, 109 Conn. App. 617, 625–26, 952 A.2d 95 (2008) (police had reasonable and articulable suspicion that defendant was operating vehicle under influence of intoxicating liquor or drugs when identifiable citizen informant reported erratic driving and details of defendant's vehicle was corroborated by police); *State* v. *Kimble*, 106 Conn. App. 572, 598, 942 A.2d 527 ("[f]light from the police properly can be considered in determining whether a reasonable and articulable basis of suspicion exists [when] the defendant flees before the police attempt to stop him" (internal quotation marks omitted)), cert. denied, 286 Conn. 912, 950 A.2d 1289 (2008). As a result, Trooper Ouellette was permitted to detain the defendant to maintain the status quo for a brief period of time to enable her to investigate. See *State* v. *Barone*, supra, 154 Conn. App. 555–56.

The defendant relies on *State* v. *Davis*, supra, 331 Conn. 239, for his contention that his field sobriety test, the search warrant application, and his blood alcohol content were the tainted fruit of an illegal detention. Specifically, he argues that Trooper's Ouellette's use of handcuffs to detain him was illegal because he was not committing any crime at the time of the restraint and that, as a result, the fruits of that illegal detention were subject to suppression. We disagree.

In *Davis*, the police received an anonymous 911 telephone call regarding " 'a young man [who] ha[d] a handgun.' " Id., 242. The caller reported that he could see " 'a whole bunch of men' " gathered around a black Infiniti and that one of these men was carrying a handgun. Id. The caller, however, could not identify the specific person who was carrying the gun because all of the men were wearing dark clothing. Id. When the police arrived at the scene, they observed six men standing around a black Infiniti. Id., 243. As they approached the men, the men walked away, until the police ordered them to stop. Id. Five of the men stopped but one of

them, the defendant, continued walking away from the police. Id. As he was walking away, the defendant held his right hand at his waist in front of his body, extended his arm, and dropped an object into a garbage can. Id. Shortly after dropping the object, the defendant turned around and said something to the effect of " 'who, me?' " Id. The police arrested the defendant, and a subsequent search of the garbage can produced a nine millimeter handgun. Id.

The defendant was charged with criminal possession of a pistol and carrying a pistol without a permit. Id. Thereafter, he filed a motion to suppress the handgun, claiming that his detention violated the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the Connecticut constitution, and that the search of the garbage can was tainted by his unconstitutional seizure. Id. The defendant argued that the anonymous telephone tip was not sufficiently reliable to give rise to a reasonable and articulable suspicion that he was engaged in criminal activity. Id. The trial court denied the defendant's motion to suppress, and the defendant entered a conditional plea of nolo contendere to the gun charges. Id., 244–45.

On appeal, our Supreme Court concluded that the trial court improperly denied the defendant's motion to suppress. Id., 257. Our Supreme Court concluded that the anonymous tip was not sufficiently detailed to enable the police to know which one of the six individuals they had detained possessed the handgun. Id., 256. Because the tip was not sufficiently detailed, the tip "did not give rise to a reasonable suspicion that any of the individuals gathered in the vicinity of the black Infiniti, including the defendant, was in possession of a handgun," justifying an investigative stop. Id., 257. Accordingly, our Supreme Court concluded that the seizure of the defendant violated his fourth amendment rights and reversed the trial court's judgment. Id., 257–58.

The facts of *Davis* are markedly distinguishable from those in the present case. Here, Bossie provided the dispatcher with specific information about the accident in which he identified the defendant and Charette as the occupants of the vehicle. Bossie also explained to the dispatcher that the defendant and Charette were attempting to leave the scene by hitchhiking. The dispatcher confirmed this through the department's live feed cameras and relayed this information to Trooper Ouellette as she was traveling to the scene. Unlike in *Davis*, there was no question in the present case about the identity of the individuals involved in the accident. Trooper Ouellette, therefore, upon arriving at the scene, was able to form a reasonable and articulable suspicion under the totality of the circumstances that the defendant was involved in criminal activity.[6] Accordingly, the defendant's reliance on *Davis* is misplaced.

Even if we were to assume, however, that evidence of the defendant's field sobriety test was the fruit of an illegal detention and should have been suppressed, evidence of the defendant's blood alcohol content was not subject to suppression because the search warrant contained ample independent evidence supporting a finding of probable cause. "[I]t is well recognized that the exclusionary rule has no application [when] the [g]overnment learned of the evidence from an independent source. . . . Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, in fact, by a search untainted by illegal police activity. . . . The doctrine is based on the premise that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position [than] they would have been in if no police error or misconduct had occurred. . . . In the case of a search conducted pursuant to a search warrant, [t]he two elements that must be satisfied to allow admission [under the independent source doctrine] are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal [conduct]; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." (Emphasis in original; internal quotation marks omitted.) *State* v. *Bardales*, 164 Conn. App. 582, 612–13, 137 A.3d 900 (2016).

In the present case, the trial court declined to suppress evidence of the defendant's blood alcohol content, concluding that the search warrant was not defective in any way and that it "would have been signed [and] the blood test results would have been provided to the state." In the affidavit attached to the search warrant application, Trooper Ouellette attested that (1) she was dispatched to a motor vehicle accident and was advised en route that the two occupants in the vehicle were running from the scene, (2) upon speaking with the defendant, she immediately detected the odor of alcohol coming from his breath and noticed that that his speech was slow and slurred and his eyes were glossy, (3) she inspected the defendant's vehicle and observed an empty bottle of beer, an empty bottle of Jägermeister, and two full bottles of vodka, and (4) a witness told her at the scene that he had observed the defendant's vehicle traveling at a high rate of speed, slide out of control, and crash and that, when he spoke to the defendant, he could smell alcohol on his breath. The defendant does not challenge the admission of any of this evidence on appeal. We conclude, therefore, that the first element of the independent source doctrine was satisfied because the search warrant contained ample evidence that established the requisite probable cause independent of the defendant's field sobriety test. See *State* v. *Bardales*, supra, 164 Conn. App. 613.

The second element of the independent source doctrine also was satisfied. In light of the significant amount of untainted evidence suggesting that the defendant had been operating his motor vehicle while under the influence of intoxicating liquor, it is inconceivable that Trooper Ouellette would not have sought a search warrant for his blood test results, irrespective of the additional information purportedly gained from the allegedly tainted field sobriety test. See *State* v. *Cobb*, 251 Conn. 285, 336, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000) (inconceivable that police would not have sought search warrant when warrant affidavit contained ample evidence of criminal activity irrespective of additional information purportedly gained in illegal manner). Accordingly, the trial court properly denied the motion to suppress as to evidence of the defendant's blood alcohol content because it was untainted by any alleged illegality.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In his principal appellate brief, the defendant continually argues that the *arrest warrant* application was the tainted fruit of the poisonous tree and should have been suppressed. The defendant argues, inter alia, that he "should be able to suppress the field sobriety test and the arrest warrant, which allowed the state to test [the] alcohol levels in his blood" and that "the arrest warrant application and the blood alcohol findings should also be suppressed considering the fact that the judge would have considered the field sobriety test in signing the warrant to seize his medical records." It is undisputed, however, that the search warrant application, rather than the arrest warrant application, was used to seize the evidence of the defendant's blood alcohol content. Accordingly, we conclude that the defendant's references to the arrest warrant application are mistaken, and we will refer in this opinion to the allegedly tainted application as the search warrant application. See *Papagorgiou* v. *Anastopoulous*, 29 Conn. App. 142, 148–49, 613 A.2d 853 ("Neither this court nor our Supreme Court is bound by the issues as framed by the parties in their statement of the issues. Rather, our analysis is addressed to the contents of the brief."), cert. denied, 224 Conn. 919, 618 A.2d 527 (1992).

[2] Trooper Ouellette testified that the horizontal gaze nystagmus test checks for signs of impairment by showing involuntary eye movements that are indicative of alcohol or drug consumption.

[3] The defendant also was charged with operation of a motor vehicle without minimum insurance in violation of General Statutes § 14-213b (a). The court granted the defendant's motion for a judgment of acquittal on that charge in the absence of an objection from the state, and the charge was omitted from the substitute information that was submitted to the jury.

[4] "It is axiomatic that [u]nder the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality." (Internal quotation marks omitted.) *State* v. *Heck*, 128 Conn. App. 633, 642–43, 18 A.3d 673, cert. denied, 301 Conn. 935, 23 A.3d 728 (2011).

[5] In his appellate brief, the defendant argues that the fact that the jury found him not guilty of evasion of responsibility means that Trooper Ouellette did not have a reasonable and articulable suspicion that a crime had been committed when she detained him. The defendant has cited no authority in support of his proposition that an acquittal on that charge compels the conclusion that Trooper Ouellette did not have a reasonable and articulable suspicion that the defendant had committed a crime, nor are we aware of any Connecticut authority that stands for such a proposition. Indeed, it is well established that the standards of proof for a reasonable and articulable suspicion and a conviction are different. See *State* v. *Johnson*, 165 Conn. App. 255, 289, 138 A.3d 1108 ("[i]t is axiomatic that the state is required to prove all the essential elements of the crimes charged beyond a reasonable doubt in order to obtain a conviction" (internal quotation marks omitted)), cert. denied, 322 Conn. 904, 138 A.3d 933 (2016); *State* v. *Barone*, supra,

154 Conn. App. 555–56 (setting forth reasonable and articulable suspicion standard). The defendant's argument, therefore, has no basis in law.

[6] To the extent that the defendant argues that Trooper Ouellette's detention of him was illegal because he was not committing any crime when she arrived at the scene and was cooperating with her, the defendant misconstrues the reasonable and articulable suspicion standard. "[A] police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual *has committed or is about to commit a crime*." (Emphasis added; internal quotation marks omitted.) *State* v. *Davis*, supra, 331 Conn. 247. Whether the defendant was committing a crime at the time of Trooper Ouellette's arrival, therefore, is irrelevant as long as Trooper Ouellette had a reasonable and articulable suspicion that the defendant already had committed a crime. As previously observed, under the totality of the circumstances, Trooper Ouellette could have formed a reasonable and articulable suspicion that the defendant had committed a crime. The defendant's argument, thus, is unpersuasive.

———————————————